

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-23-2000

# Morales v. Apfel

Precedential or Non-Precedential:

Docket 99-1938

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Morales v. Apfel" (2000). *2000 Decisions.* Paper 172.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/172

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 22, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1938

WILLIAM MORALES, Appellant

v.

KENNETH S. APFEL, COMMISSIONER OF
SOCIAL SECURITY

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 98-5022)
District Judge: Honorable Anita B. Brody

Argued: April 25, 2000

Before: BECKER, Chief Judge, WEIS,
and OAKES,* Circuit Judges.

(Filed August 22, 2000)

      ERIC J. FISCHER, ESQUIRE
       (ARGUED)
      Breyer Office Park, Suite 110
      8380 Old York Road
      Elkins Park, PA 19027

Counsel for Appellant

_____

* The Honorable James L. Oakes, United States Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, sitting by designation.

John M. Sacchetti
Regional Chief Counsel
Patricia M. Smith
Deputy Chief Counsel
Nicholas R. Cerulli (ARGUED)
Kelly C. Connelly
David M. Frazier
Assistant Regional Counsel
Office of the General Counsel
Region III
Social Security Administration
P.O. Box 41777
Philadelphia, PA 19101

Michael R. Stiles
United States Attorney
John Pease
Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street
Suite 1250
Philadelphia, Pennsylvania 19106-4476

Counsel for Appellee

OPINION OF THE COURT

OAKES, Senior Circuit Judge.

William Morales appeals the decision of the United States District Court for the Eastern District of Pennsylvania (Brody, Judge) approving and adopting the Report and Recommendation of the United States Magistrate (Scuderi, M.J.) affirming the Commissioner of Social Security's conclusion that Morales is not entitled to Disability Insurance Benefits (DIB) or Supplemental Security Income (SSI) under Titles II and IV of the Social Security Act, 42 U.S.C. SS 401-433, 1381-1383f. Because the Commissioner's decision is not supported by substantial evidence, we reverse the district court.

2

BACKGROUND

I. Procedural History.

Morales filed applications for DIB and SSI on July 31, 1990, claiming disability starting August 15, 1989. His application was initially denied on September 12, 1990, and denied again on April 27, 1993, upon reconsideration by the agency responsible for disability determinations. More than two and a half years later, on May 12, 1993, the Appeals Council denied Morales's application. Thereafter, Morales, now represented by counsel, filed a request for an administrative hearing which took place approximately a year later on June 15, 1994. The Administrative Law Judge (ALJ) denied Morales's application based on Morales's work activity between May and September 1991 which the ALJ determined disqualified Morales from DIB entitlement. The Appeals Council denied Morales's request for review of the ALJ's decision. Morales filed a civil action in the United States District Court for the Eastern District of Pennsylvania. The Commissioner conceded the inadequacy of his prior administrative evaluation and on September 28, 1995, the district court remanded the case for further evaluation.

A supplemental administrative hearing was held on April 9, 1997. On May 13, 1997, a second ALJ denied Morales's application, finding that Morales was not disabled because he could perform his past relevant work at all times after his alleged disability onset date. The Appeals Council denied Morales's appeal. Morales filed a second civil action in the United States District Court for the Eastern District of Pennsylvania. A United States Magistrate Report and Recommendation issued on August 16, 1999, endorsing the Commissioner's denial of benefits, was adopted, without opinion, by the district court on September 23, 1999. This appeal followed.

II. Facts.

Morales was born on December 1, 1960, and his life has been marked by mental health problems and drug and alcohol abuse. At the age of eight, Morales began to abuse alcohol accompanied by marijuana, L.S.D., Valium, and other drugs. Morales testified at the hearing that he had

3

completed a seventh-grade education, but had repeated the grade three times.[1] Morales last worked as a landscaper for four months in 1991, when he earned $3462. Morales's other past relevant work includes jobs as a laborer and a packing line worker.

On August 19, 1987, when Morales was twenty-six-years old, he was diagnosed with a Dependent Personality Disorder[2] and polysubstance dependence. Psychotherapy records completed by Morales's treating psychiatrist, Roger Erro, M.D., indicate that Morales is depressed, thinks often of killing himself, and gets violently angry.

There is evidence in the record of Morales's drug and alcohol dependence. On October 10, 1990, Morales received treatment for drug and alcohol abuse. At the administrative hearing, he testified that he drank a lot and once in a while used cocaine. His attorney conceded that Morales has a continuing major drug and alcohol problem.

Morales was incarcerated from 1989 to 1990 after a conviction for threatening a police officer. While in prison, he attempted suicide by cutting both his wrists. William Clovis, M.D., of Hahnemann University Correctional Mental Health Services Program consequently examined Morales and described him as depressed with suicidal plans, poor insight, and poor judgment. He diagnosed Morales with psychoneurotic depression, treated him with Xanax, Halcion, and later with Valium, and labeled his prognosis as fair.

After Morales applied for disability benefits, he was examined by a slew of psychologists and psychiatrists. He was first referred to Luis Bird, M.D., from the Pennsylvania Bureau of Disability Determination, who, after examining

_____

1. At other places in the record, Morales stated that he had completed a fifth-grade education and an eighth-grade education.

2. "A Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment." Diagnostic and Statistical Manual of Mental Disorders, 629 (4th ed., Amer. Psych. Assn. 1994).

4

Morales filed a report on August 30, 1990. During the examination, Morales stated that since he had been out of jail, he could not sleep and had "crazy ideas about hurting himself." He also said that he had heard voices and had other hallucinations when he was in jail in January 1990. Dr. Bird noted Morales's mood was depressed and anxious. He also noted Morales had a difficult time with the cognitive part of the examination and that his general fund of knowledge was quite poor. He concluded that Morales has "an adjustment disorder with mixed emotional features" and an impaired ability to concentrate, perform activities within a schedule, make decisions, be aware of normal hazards, and function when under stress or change.

On April 13, 1993, Morales underwent a second psychiatric evaluation for the Pennsylvania Bureau of Disability Determination with Richard Jaffe, M.D. During this interview, Morales's sister acted as an interpreter. Dr. Jaffe's report indicates that Morales was treated weekly at a mental health center for the three years prior to the evaluation and took Xanax three times a day. Dr. Jaffe documented Morales's poor grooming and hygiene and reported that Morales's ability to get along with others appeared "markedly impaired." Relevant to Morales's ability to work, Dr. Jaffe opined that Morales appeared to be markedly irresponsible with a history of multiplefirings due to poor performance on the job and poor interactions with others. He also reported that Morales's ability to attend to a task from beginning to end, to sustain a routine, to perform at a certain pace, to make decisions, to react to deadlines and schedules, and to maintain regular attendance is poor. Finally, he opined that Morales is likely to become physically abusive and threatening to others in conflict situations.

Dr. Jaffe also suggested that he suspected Morales was malingering3 during the examination. He reported that

_____

3. "Malingering" is a medical term defined as the willful, deliberate, and fraudulent feigning or exaggeration of the symptoms of illness or injury. Dorland's Illustrated Medical Dictionary 982 (2d ed. 1994). The Diagnostic and Statistical Manual of Mental Disorders notes that individuals who suffer from Antisocial Personality Disorder may "repeatedly lie . . . con others, or malinger." Diagnostic and Statistical Manual of Mental Disorders, 646 (4th ed., Amer. Psych. Assn. 1994).

> [o]n attempting to test his sensorium, he was extremely
> uncooperative and appeared to be malingering on many
> responses. In comparing the current examination with
> that done by Dr. Bird, who was able to interview him
> in Spanish, it would appear that he was not making
> any efforts to answer questions correctly. He gave the
> incorrect day of the week and incorrectly said he was
> in Michigan, when asked where he was. He also
> reported being unable to remember his own birth date,
> which he was able to do with Dr. Bird before. He,
> likewise, was unable to recall three repeated items after
> several minutes, but the three answers he gave instead
> were similar to those asked. For example, he
> spontaneously remembered orange instead of red, and
> remembered chair instead of table. This suggested that
> he knew, in fact the correct responses and was
> deliberately giving incorrect answers.

Dr. Jaffe noted that evaluating Morales's cognitive ability
was not possible "due to what appeared to be deliberate
falsifying of responses on the part of the applicant." Despite
notes that Morales was malingering, Dr. Jaffe diagnosed
Morales with a personality disorder with both explosive and
anti-social features. Dr. Jaffe's diagnosis is consistent with
the Diagnostic and Statistical Manual of Mental Disorders
which states that malingering is a symptom of Antisocial
Personality Disorder. See Diagnostic and Statistical Manual
of Mental Disorders, 646 (4th ed., Amer. Psych. Assn.
1994). He indicated that Morales's prognosis was"probably
poor for any significant change over the next year, even
with on-going counseling at the APM Mental Health
Center."

Morales was next sent for cognitive testing to be
evaluated by psychologist Marged Lindner, Ph. D., with his
sister acting as interpreter. The resultant reportfiled on
April 19, 1993, indicates that Morales's IQ score is 51 with
a verbal score of 52 and a performance score of 55. These
scores are in the range of mild mental retardation. See
Diagnostic and Statistical Manual of Mental Disorders, 46
(4th ed., Amer. Psych. Assn. 1994). Dr. Lindner reported
that Morales's "ability to perform work-related activities
appears to be limited. He could understand, retain and

6

follow certain kinds of instructions and perform simple repetitive tasks. His ability to relate to people is poor and his ability to tolerate pressure is poor." Like Dr. Jaffe, Dr. Lindner reported her doubt that Morales fully cooperated with the testing. However, she gave credit to her measure of Morales's IQ score.

Two reports assessing Morales's ability to perform work-related tasks are also in the record. A Mental Residual Functional Capacity Assessment form was completed on September 10, 1990, by a non-examining state agency psychologist, Joseph Barrett, Ph. D. After reviewing Morales's medical record which, at this point in time, did not include Dr. Lindner's or Dr. Jaffe's reports, Dr. Barrett, a vocational psychologist, opined that Morales is"not significantly limited" in the ability to perform the following work-related activities: remember locations and work-like procedures, understand and remember simple instructions, ask simple questions or request assistance, maintain socially appropriate behavior, take normal precautions, and use public transportation. Dr. Barrett also opined that Morales is only "moderately limited"4 in his ability to perform the following: understand and remember detailed instructions, carry out simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted, make simple, work-related decision, complete a normal work week or work day without interruption from psychologically based symptoms, interact with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Finally, Dr. Barrett reported that Morales's ability to carry out detailed instructions was "markedly limited." On April 21, 1993, Edward C. Brennan, M.D., a second physician

_____

4. At the administrative hearing, the vocational expert, who relied on Dr. Barrett's report to testify, defined "moderately limited" to mean the claimant is unable to perform the task up to a third of the time.

7

who did not personally examine Morales, summarily affirmed Dr. Barrett's report.

Dr. Erro, Morales's treating psychiatric physician since November 1991, also prepared a Mental Residual Functional Capacity Assessment. He completed his evaluation on September 16, 1993. Contrary to Dr. Barrett's report, Dr. Erro reported that Morales's ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with a supervisor, function independently, and maintain attention or concentration was "seriously limited."[5] In addition, his ability to deal with work stresses, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability is rated by Dr. Erro as "poor or none."[6] The treatment records attached to the evaluation indicate that Morales is stressed, anxious, manipulative, demanding, and is treated with various psychotropic drugs. The records also show that Morales does well on Xanax and that through August 1993, his anxiety was under adequate control with medication.

Morales testified at both of his hearings and told the ALJ that he did not speak a lot of English. Morales testified that he had seen a psychiatrist two times a month since he was released from jail. He testified that he does not "have the mind for a job" and that he was fired from the landscaping job in 1991 because of problems with drugs, fighting, and absenteeism. He testified that he was fired from every job he ever had because of fighting. Morales also testified that he heard voices that made him very angry and want to hit things.

The ALJ concluded that Morales has a severe adjustment disorder impairment in addition to a drug and alcohol addiction. Furthermore, the ALJ found that Morales's return to work in 1991 was substantial gainful activity rather than an unsuccessful work attempt, stating that "I am convinced that lack of motivation and social immaturity

_____

5. "Seriously limited" is defined as the "ability to function in this area is seriously limited but not precluded."

6. "Poor to none" is defined as having "no useful ability in this area."

were the causes of leaving his last two jobs." The ALJ rejected the reports of Dr. Erro and Dr. Jaffe and Dr. Lindner's IQ scores, reasoning that the results reached by these physicians were because Morales was "manipulative, unmotivated, and possibly malingering" and that the IQ scores "do not comport with claimant appearance and demeanor or with the evidence in the record." The ALJ also rejected Morales's testimony, finding that Morales was not credible. The ALJ's decision indicates that the ALJ was influenced by his impression of Morales as immature, manipulative, and unmotivated. Based on the vocational expert's testimony at the administrative hearing that a hypothetical individual with Morales's age, education, work experience, and the limitations described in the Mental Residual Functional Capacity Assessment completed by Dr. Barrett, could perform the jobs of laborer, landscaper, farm laborer, and packing line worker, the ALJ found that Morales could perform any of his past jobs. Accordingly, the ALJ concluded that Morales was not disabled and denied his applications for DIB and SSI.

DISCUSSION

In order to establish eligibility for social security DIB and SSI, a claimant has the burden of demonstrating that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. S 423(d)(1)(A) (2000 Cum. Annual Pocket Part); 20 C.F.R. S 416.905(a) (1999).

To determine whether a claimant is entitled to disability benefits, the Commissioner applies a sequentialfive-step inquiry pursuant to 20 C.F.R. S 404.1520.

> [T]he [Commissioner] determines first whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he [or she] will be found not disabled regardless of the medical findings. If an individual is found not to be engaged in substantial gainful activity,

9

the [Commissioner] will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. If the [Commissioner] determines that the claimant suffers from a severe impairment, the [Commissioner] will next determine whether the impairment meets or equals a list of impairments in Appendix I of sub-part P of Regulations No. 4 of the Code of Regulations. If the individual meets or equals the list of impairments, the claimant will be found disabled. If he [or she] does not, the [Commissioner] must determine if the individual is capable of performing his [or her] past relevant work considering his [or her] severe impairment. If the [Commissioner] determines that the individual is not capable of performing his [or her] past relevant work, then he must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he [or she] is capable of performing other work which exists in the national economy.

Brewster v. Heckler, 786 F.2d 581, 583-84 (3d Cir. 1986) (internal citations omitted).7 The claimant bears the burden of establishing that he or she is incapable of performing his or her past relevant work due to a physical or mental impairment. See Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983). In this case, the ALJ concluded that Morales retained the ability to perform his past relevant work as a

_____

7. The regulations dealing specifically with mental impairments further require the Commissioner to record the pertinent symptoms and effect of treatment to determine if an impairment exists. See 20 C.F.R. S 404.1520a(b)(1) (1999). If an impairment is found, the Commissioner must analyze whether certain medical findings relevant to the claimant's ability to work are present or absent. See 20 C.F.R. S 404.1520a(b)(2). The Commissioner must then rate the degree of functional loss in certain areas deemed for work including daily living, social functioning, concentration, persistence or pace, and deterioration in work-like settings. See 20 C.F.R. S 404.1520a(b)(3). If the mental impairment is considered "severe," the Commissioner must determine if it meets a listed mental disorder. If it is severe but does not equal a listed disorder,
the Commissioner must conduct a residual functional capacity assessment. See 20 C.F.R. S 404.1520a(c)(3). At each level of administrative adjudication, a Psychiatric Review Treatment Form must be completed. See 20 C.F.R. S 404.1520a(d).

landscaper and consequently was not disabled under the statute.

Our review of the Commissioner's final decision denying Morales disability benefits is not plenary. We are bound to the Commissioner's findings of fact if they are supported by substantial evidence in the record. See 42 U.S.C. S 405(g) (2000 Cum. Annual Pocket Part); Plummer v. Apfel , 186 F.3d 422, 427 (3d Cir. 1999); Hartranft v. Apfel , 181 F.3d 358, 360 (3d Cir. 1999); Jones v. Sullivan, 954 F.2d 125, 127–28 (3d Cir. 1997); Daring v. Heckler, 727 F.2d 64, 68 (3d Cir. 1984). "Substantial evidence" is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer, 186 F.3d. at 422 (citing Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir, 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citation omitted))). As this Court has stated previously,

> our decisions make clear that determination of the existence vel non of substantial evidence is not merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by counterveiling evidence. Nor is evidence substantial if it is overwhelmed by other evidence -- particularly certain types of evidence (e.g., that offered by treating physicians) -- or if it really constitutes not evidence but mere conclusion.

Kent, 710 F.2d at 114; Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986). Despite the deference due to administrative decisions in disability benefit cases, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner argues that its finding that Morales could return to his past relevant work is supported by substantial evidence in the record and must be affirmed. Our review of the record, however, convinces us that the ALJ erred in applying the relevant legal standards to the

11

facts of this case. In particular, the ALJ improperly supplanted the opinions of Morales's treating and examining physicians with his personal observation and speculation. His subsequent reliance on the testimony of a vocational expert that did not consider this evidence, therefore, does not meet the substantiality test.

The ALJ rejected Dr. Erro's opinion that Morales was "seriously limited" in his ability to perform work-related tasks and accepted instead the opinion of non-examining physician Dr. Barrett as reaffirmed by Dr. Brennan. Dr. Erro, who had treated Morales from January 1991 through September 1993, concluded that Morales's ability to follow work rules, relate to co-workers, deal with the public, use proper judgment, interact with a supervisor, function independently, and maintain attention or concentration was "seriously limited." He also concluded that Morales's ability to deal with work stress, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability was "poor to none." The ALJ rejected Dr. Erro's evaluation based on his personal observations of Morales at the administrative hearing, the evidence in the record of malingering, and notations in Dr. Erro's treatment notes that Morales was stable and well controlled with medication.

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Plummer, 186 F.3d at 429 (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987)); see also Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir. 1994); Jones, 954 F.2d at 128; Allen v. Bowen, 881 F.2d 37, 40-41 (3d Cir. 1989); Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988); Brewster, 786 F.2d at 585. Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429 (citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)). The ALJ must consider the medical findings that support a treating

12

physician's opinion that the claimant is disabled. See Adorno, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. Plummer, 186 F.3d at 429; Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988); Kent, 710 F.2d at 115.

The ALJ's refusal to credit Dr. Erro's opinion was not based on objective medical evidence. The ALJ rejected Dr. Erro's opinion simply because he did not believe Morales's testimony at the hearing and because Dr. Jaffe and Dr. Lindner noted that Morales appeared to be malingering in their examinations of him. Although an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments, they alone do not carry the day and override the medical opinion of a treating physician that is supported by the record. Dr. Erro, who had treated Morales for three years, concluded that Morales was markedly limited in a number of work-related activities. This opinion is supported by the conclusions reached by Dr. Jaffe and Dr. Lindner. The ALJ cannot, as he did here, disregard this medical opinion based solely on his own "amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility." Kent, 710 F.2d at 115.

Dr. Jaffe's and Dr. Lindner's mentions of malingering also do not justify rejecting outright Dr. Erro's opinion. Despite Dr. Jaffe's and Dr. Lindner's observations of possible malingering on the part of Morales, Dr. Jaffe ultimately concluded that Morales suffered from a "personality disorder with explosive and anti-social features" and Dr. Lindner gave Morales an IQ score of 51, a range that classifies him as at least mildly mentally retarded. Dr. Jaffe specifically determined that Morales's ability to attend to a job from beginning to end, to sustain a routine, perform at a certain pace, make decisions, react to deadlines and schedules, and maintain proper attendance is "poor." The ALJ ignored the ultimate conclusions and medical symptomatology in these reports that lend support to Dr.

13

Erro's opinion and chose instead to draw his own medical conclusion based solely on a credibility determination and the pieces of the examination reports that supported this determination. The Commissioner cannot reject Dr. Erro's medical opinion simply by having the ALJ make a different medical judgment. Here, the objective medical conclusions of Dr. Jaffe and Dr. Lindner support, rather than contradict, Dr. Erro's assessment. Because the ALJ's rejection of Dr. Erro's opinion based on the scant evidence of malingering is a function of lay speculation that is overwhelmed by counterveiling medical expert evidence, the ALJ did not give proper weight to Dr. Erro's opinion.

The ALJ also erred by ignoring Dr. Jaffe's conclusions about Morales's work ability and the IQ scores reported by Dr. Lindner. The only reason provided for the ALJ's rejection of Dr. Jaffe's opinion is his conclusion that these results are unreliable because Morales is manipulative. As we have explained, this credibility determination is not objective medical evidence and not an acceptable basis standing alone for rejecting an examining physician's conclusion. For the same reason, the ALJ incorrectly refused to consider Morales's IQ score. The ALJ reasoned that the "IQ scores do not comport with claimant appearance and demeanor or with the evidence in the record" and reasoned that Morales had lied about his education, could follow the plots of daytime television shows, and "that a person with an IQ in the 50s could not function in a normal work environment as claimant was able to do so when it suited him." An ALJ cannot reject IQ scores based on personal observations of the claimant and speculative inferences drawn from the record. Certainly, no doctor in the record made any statement which would support the ALJ's speculation that "[a] person with an IQ in the 50s could not function in a normal work environment as claimant was able to do when it suited him." Because Dr. Jaffe's conclusions and the IQ scores were not discredited based on objective medical evidence, they should have been fully considered in assessing Morales's ability to perform his past work.

Nor was it proper for the ALJ to reject Dr. Erro's opinion based on Dr. Erro's notation that Morales was stable with

14

medication. The relevant inquiry with regard to a disability determination is whether the claimant's condition prevents him from engaging in substantial gainful activity. See 42 U.S.C. S 423(d)(1)(A). For a person, such as Morales, who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic. Dr. Erro's observations that Morales is "stable and well controlled with medication" during treatment does not support the medical conclusion that Morales can return to work. Dr. Erro, despite his notation, opined that Morales's mental impairment rendered him markedly limited in a number of relevant work-related activities. Other information in the treatment records supports this opinion. Thus, Dr. Erro's opinion that Morales's ability to function is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting.

The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability. This Court has said before that an ALJ's personal observations of the claimant "carry little weight in cases . . . involving medically substantiated psychiatric disability." Daring , 727 F.2d at 70. Conceivably, malingering and manipulation are symptoms of the anti-social personality disorder, from which, the record indicates, Morales suffers. See Diagnostic and Statistical Manual of Mental Disorders, 646 (4th ed. Amer. Psych. Assn. 1994) ("individuals with Antisocial Personality Disorder . . . may repeatedly lie, use an alias, con others, or malinger."). Thus, these symptoms support, rather than contradict Dr. Erro's, Dr. Jaffe's, and Dr. Lindner's ultimate conclusions. Accordingly, the ALJ's conclusory rejection of Dr. Erro's opinion based on three years of treating Morales was improper. Dr. Erro's evaluation and opinion, the IQ scores, and Dr. Jaffe's conclusions should have been fully considered by the ALJ in evaluating whether Morales is capable of performing substantial gainful employment.

To conclude that Morales could perform his past work, the ALJ also relied on the fact that Morales worked as a

15

landscaper for a total of four months in 1991. The ALJ hastily concluded that Morales terminated this employment on his own volition because of laziness. There is no evidence to support the ALJ's conclusion except his own speculative judgment. The employer's note in the record states only that Morales quit the job and does not provide any further explanation. The evidence in the record supports the conclusion that the symptoms of Morales's personality disorder made working with others impossible and Morales's effort at landscaping was an unsuccessful work attempt. It bears repeating that the question posed by a disability determination is whether the claimant can engage in substantial gainful activity. An attempt to work that ultimately fails because of the symptoms of the disability is not substantial gainful activity. Thus, the fact that Morales managed to work for four months does not, standing alone in contrast to significant evidence of disability, preclude a finding that Morales is disabled.

The ALJ's conclusion that Morales can return to his past relevant work must be reversed. Shorn of its rhetoric, this determination rests solely on a rejection of medically-credited symptomatology and opinion, the ALJ's personal observations and speculation, and the testimony of a non-examining vocational expert who considered only a hypothetical based on Dr. Barrett's check-list report written in 1990, long before the record was complete, and only summarily approved in 1993. The Brennan/Barrett report indicates that Morales is only "moderately limited" in work-related activities. This classification was reached only by a review of the record and is contradicted by the opinions of Dr. Erro, Dr. Jaffe, and Dr. Lindner. Furthermore, the Brennan/Barrett check-list-style report was prepared without the benefit of an examination of Morales, Dr. Jaffe's report, Dr. Lindner's tests, and Dr. Erro's work-skills assessment. "[I]t is well established that the opinions of a doctor who has never examined a patient `have less probative force as a general matter, than they would have had if the doctor had treated or examined him.' " Brewster, 786 F.2d at 585 (quoting Podedworny v. Harris , 745 F.2d 210, 217 (3d Cir. 1984) (internal quotations omitted)). Furthermore, a single piece of evidence is not substantial if the Commissioner failed to resolve a conflict created by

16

counterveiling evidence or if it is overwhelmed by other evidence -- particularly that offered by a treating physician. See Gilliland, 786 F.2d at 183, Kent, 710 F.2d at 114. "Vocational expert testimony alone does not provide the necessary substantial evidence from which to deduce a capacity to engage in substantial gainful activity when there is overwhelming evidence to the contrary in the record." DeLeon v. Secretary of Health and Human Services, 734 F.2d 930, 934-35 (2d Cir. 1984). Because the ALJ did not give proper consideration to the opinions of Dr. Erro, Dr. Jaffe, and Dr. Lindner, all of which present counterveiling evidence to the Brennan/Barrett evaluation, the vocational expert testimony does not meet the substantiality test.

The question remaining is whether this case should be remanded to the Commissioner for further administrative proceedings or reversed with direction to the District Court that benefits be awarded. This case, like many others involving disability determinations, has suffered considerable inexplicable delays, see Plummer , 186 F.3d at 435, and we hesitate to add further abeyance. Morales has had two hearings before an ALJ followed by two petitions to the appeals council, two appeals to the district court, and the present appeal to the court of appeals. The disability determination has already taken ten years and the record is unlikely to change. Furthermore, the delay in this case has been caused by deficiencies that are not attributable to any error of the claimant. See Podedworny, 745 F.2d at 223. Moreover, the extensive medical record, wrongly rejected by the ALJ, is substantial evidence that Morales suffers from a severe mental disability that renders him unable to engage in substantial gainful activity. In Podedworny, this Court instructed that "[t]he decision to direct the district court to award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits." Id. at 222. In our view, that test is met here. Because substantial evidence dictates a finding by the Commissioner that Morales is disabled and entitled to disability benefits, we reverse the judgment of the district

17

court and do not remand this case for further administrative proceedings.

III. CONCLUSION

For the foregoing reasons, this Court will reverse the district court's grant of summary judgment and remand this case to the district court with directions to award appellant the benefits to which he is entitled from August 15, 1989.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit