**Judy CURRY, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner,
Social Security Administration,
Defendant.**

No. CIV.A.02–4564.

United States District Court,
E.D. Pennsylvania.

Feb. 25, 2003.

Meyer Silver, Esquire, Silver & Silver, Ardmore, PA, for Plaintiffs.

Nicholas Cerulli, Esquire, Social Security Administration, Philadelphia, PA, for Defendants.

## MEMORANDUM & ORDER

KATZ, Senior District Judge.

### I. Statement of the Case

Plaintiff brings this action to challenge the denial by the Commissioner of the Social Security Administration of her claim for Disability Insurance Benefits.[1]

Because the administrative decision is not supported by substantial evidence, the plaintiff, Ms. Curry, is entitled to disability benefits.

### II. Statement of Facts

On April 1, 2000, Ms. Curry was involved in a motor vehicle accident. She immediately felt a "snap" in her cervical spine followed by a burning sensation and a headache. (R. 118, 124). Thereafter, on April 6, 2000, Ms. Curry sought treatment with Dr. Alexander Bunt, Jr. Ms. Curry was suffering from neck and shoulder pain, cervical stiffness and soreness and headache (R. 125). On physical examination,

---

1. On September 9, 2002, the Commissioner moved to remand the case because the file was lost. Plaintiff had no objection to the remand. On October 7, 2002, the court remanded the case. On October 23, 2002, the Commissioner moved to vacate the Order remanding the case because the file was found. There being no objection, the court vacated the Order of remand on November 26, 2002. The administrative record was filed December 6, 2002. The original Complaint was filed July 9, 2002 and service was accepted July 11, 2002.

Dr. Bunt found neck pain on passive range of motion (ROM), spasms, and edema in her upper extremities. His diagnosis was cervical strain. He prescribed Motrin and Flexeril and referred her for physical therapy. (R. 123, 126, 130–148).

Ms. Curry continued treatment with Dr. Bunt through May of 2000. His medical records note that she had a herniated disc in her cervical spine, pain on palpation, constant neck pain, muscle spasms, decreased ROM in her cervical spine, and C7 paraspinal tenderness (R. 119–126, 251–252, 254–257). Dr. Bunt referred her to a neurosurgeon, Hagop L. Der Krikorian, J.D. (R. 119–122). Ms. Curry also was treated at the Brookhaven Medical Center for primary care treatment (R. 170–172).

A cervical MRI performed on May 10, 2000 found a moderate to large left extruded disc at C4–5 that touched the spinal cord and central disc protrusions at C5–6 and C6–7 (R. 179, 180, 248). On June 27, 2000 Dr. Der Krikorian examined Ms. Curry and found bilateral diminished reflexes, marked weakness of her left deltoid muscle as well as the right to a lesser extent, and bilateral hyperesthesia in the C5 and left C6 distribution. His diagnosis was ruptured extruded moderate to large C4–5 disc herniation, moderate C5 and to a lesser extent C6 radiculopathies (R. 246). A surgical consultation was performed on July 13, 200 (R. 167, 176, 244, 271).

Ms. Curry was admitted to Riddle Memorial Hospital on July 19, 2000 (R. 156–157, 268–270, 274–338). Dr. Der Krikorian performed a cervical micro-discectomy and anterior cervical fusion at C4–5 (R. 163, 164–166). An X-ray taken after surgery documented a slight displaced bone chip at C4–5 (R. 183). Ms. Curry was discharged on July 21, 2000, with a final diagnosis of a herniated disc at C4–5 and bilateral C5 radiculopathy with cord compression.

Thereafter, Dr. Der Krikorian continued to treat Ms. Curry. In August 2000, Ms. Curry noted that she had a complete resolution of almost all of her symptoms. (R. 152, 238). Thereafter, Dr. Der Krikorian referred Ms. Curry to Community Rehab Physical Therapy from September through December 2000 (R. 200–203, 204–213, 232, 236–237).

In October of 2000, Ms. Curry complained that the right side of her shoulder and neck had gotten progressively worse. Dr. Der Krikorian recommend a cervical spine MRI (R. 155, 233). On October 14, 2000, the cervical MRI documented a post anterior fusion at C4–5, progression of the central herniation at C5–6 now touching the spinal cord and a slight progression of the central disc bulge at the C6–7 level (R. 230, 356–357).

In November, 2000, Ms. Curry was suffering from neck pain that radiated to her shoulders and arms, weakness in her left forearm and shoulder, and an inability to elevate her right arm above her shoulder. On physical examination, Dr. Der Krikorian found diminished right brachioradialis and left triceps muscles, weakness of the extensors of the wrist on the left side, mild weakness in the left triceps and mild hyperesthesia in the C7–8 distribution on the left side. Dr. Der Krikorian also reviewed her MRI and found a progression to the cental herniations at C5–6 and C6–7 with early radiculopathies bilaterally but worse on the left. He recommended further testing and physical therapy (R. 153–154, 224–225). A November 9, 2000, a MRI of Ms. Curry's right shoulder documented prominent partial thickness tear of the rotator cuff tendon. (R. 158–159).

In December of 2000, Ms. Curry explained that her symptoms had remained the same. Dr. Der Krikorian noted that her Doppler study was suspicious for thoracic outlet syndrome. He referred her to an orthopedic surgeon for her shoulder (R. 151, 223).

On December 18, 2000, Ms. Curry sought treatment with orthopedic surgeon, Vincent DiStefano, M.D. She explained that she had been involved in a motor vehicle accident and since then had suffered from neck and shoulder pain. In addition, she expounded that her pain kept her from sleeping, that she could not raise her arm above her head, and had difficulty reaching. On physical examination, Dr. DiStefano found slight decreased range of motion in her neck; that she had tenderness in her acromioclavicular joint, biceps and entire rotator cuff; that she had positive Speed, Yergason, and O'Brien tests; and significant pain with cross-arm adduction. His impression was right shoulder rotator cuff tear, possible labral tear, possible joint bone edema, and arthritis. He recommended right surgical arthroscopy (R. 116, 272).

Ms. Curry was admitted to Paoli Hospital on January 23, 2001. On January 26, 2001, Dr. DiStefano performed arthroscopy of the right shoulder with a debridement of her rotator cuff, excisional arthroplasty of her acromioclavicular joint, anterior acromioplasty, subacromial bursectomy, and release of the coracoaromial ligament. His final diagnosis was partial thickness of the joint side tear of her supraspinatus, degenerative arthrosis of the acromioclavicular joint, and chronic impingement syndrome of her right shoulder (R. 115, 273, 339–353). There after, Ms. Curry fractured her fifth metatarsal of her left foot and was placed in a short leg non-walking cast (R. 112–113). On February 15, 2001, Dr. DiStefano noted that Ms. Curry ambulated with a walker only sporadically throughout the day and had reduced strength in her right arm. He recommended a strengthening program (R. 198–99).

In March of 2001, Ms. Curry again was treated by Dr. Der Krikorian. She still had neck pain with occipital headaches.

On neurological examination, Dr. Der Krikorian found diminished brachioradialis reflexes, hypesthesia in the C6 and C7 distribution, and limited motor examination of the right arm because of pain most likely postoperatively. His impression was C6 and C7 radiculopathies secondary to herniated discs and that she had an element of thoracic outlet syndrome (R. 150, 222).

On May 25, 2001, Ms. Curry was again admitted to Riddle Memorial Hospital under the care of Dr. Der Krikorian (R. 359–365). He performed an osteoplasty, anterior cervical microdisectomy at C5–6 and C6–7, and anterior cervical fusion at C5–6 and C6–7. Ms. Curry was discharged on May 29, 2001 with a diagnosis of herniated C5–6 and C6–7 discs, C6–7 radiculopathies, and cord compression (R. 358). An August 2001 cervical MRI found a spinal fusion from C4–C7(R. 368–369).

In August of 2001, Dr. Der Krikorian stated that Ms. Curry was recuperating well and that her symptoms were musculoskeletal in origin. He recommended she continue physical therapy (R. 367). On October 3, 2001, Dr. De Krikorian examined Ms. Curry and found hypoactive deep tendon reflexes in her upper extremities and mild hypesthesia in the C7 distribution on the right. He recommended she continue with home exercises (R. 366).

On October 18, 2001, Ms. Curry sought treatment with Dr. Steven Fischer due to right knee and low back pain (R. 370–371). Thereafter an MRI was performed on Ms. Curry's lumbar spine which found a small central disc herniation at L5–S1 that effaced the anterior surface of the cord and anterior aspect of the S1 nerve roots and a mild bulge at L4–5 (R. 372–373).

■ The ALJ failed to properly evaluate the opinion of Ms. Curry's treating physician, Dr. Der Krikorian. An ALJ must accord significant deference to an assessment by a claimant's treating physi-

cian. *Morales v. Apfel,* 225 F.3d 310, (3d Cir.2000); *Gilliland v. Heckler,* 786 F.2d 178, 183 (3d Cir.1986). A treating physician's opinion will be given "controlling weight," if "well supported" by clinical and diagnostic techniques. 20 C.R.F. §§ 404.1527, 416.927; SSR 96–2p. "For a medical opinion to be well supported by medically acceptable clinical and laboratory diagnostic techniques." It is not necessary that the opinion be fully supported by all of the other evidence if no other substantial evidence in the record contradicts or conflicts with it.

Ms. Curry's treating physician's medical records documented that she would be unable to work due to her numerous surgeries, pain, and recovery time. Next, the ALJ clearly misinterpreted Dr. Der Krikorian's office notes. The ALJ erroneously stated that: "[Dr. Der Krikorian] did not agree with the claimant's statement to him on October 23, 2001 that 'she cannot return to her job as a telephone operator because it involves prolonged sitting and moving her head sideways.' (Exhibit 14F at 4)" (R. 18). However, this office note actually stated:

> Mrs. Judy Curry was evaluated in my office on the 23rd day of October, 2001. Since August 30th, she reports that her overall condition has remained unchanged. She has completed a full course of physical therapy and her therapist has discharged her from the PT program. She says she still has neck pain and stiffness that she develops around fifteen minutes after a sitting position, then she develops burning sensation across the trapezius muscle. She denies any radiating pain to the upper extremities. On occasion, she experiences some numbness involving her forearm and hand on the left side lasting for less than a minute.
>
> Her neurological examination remains unchanged. Symmetrical but hypoactive deep tendon reflexes in both upper extremities, normal motor exam. Only mild hyperesthesia in the C7 distribution on the right side. She had no long tract signs.
>
> I think Mrs. Curry is recuperating well. Her symptoms are musculoskeletal in origin. Despite of her discharge from physical therapy program, I do not think she has reached a level of maximum medical improvement as yet. I had a long discussion with her and recommend that she continues home exercises to improve range of motion of her neck. She says she cannot return to her job as a telephone operator because it involves prolong sitting and moving her head sideways. She will be reevaluated in my office in 2–3 months. In the interim, she was strongly advised to give me a call in case of any further problems.

(R.366).

In his decision, the ALJ used this inaccurate interpretation of Dr. Der Krikorian's medical records to find that it was "reasonable" to accept the State Agency opinion that Ms. Curry could perform light work (R. 18). Hence, the ALJ's analysis is not supported by substantial evidence.

The ALJ found that despite all of Ms. Curry's medical problems, she retained the residual functional capacity (RFC) to perform a limited range of light work (R. 21, ALJ decision, Finding of Fact no. 7). Hence, the ALJ found at step four of the sequential evaluation that Ms. Curry was not disabled. At step five, an ALJ must determine a claimant's residual functional capacity (RFC). A RFC is defined as:

> A medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s). RFC is the maximum degree to which the individual retains the ca-

pacity for sustained performance of the physical-mental requirements of jobs. Social Security Rule (SSR) 83–10.

In determining Ms. Curry's RFC, the ALJ failed to take into consideration Ms. Curry's numerous hospitalizations and recuperation time which would clearly have an impact on her ability to perform her past relevant work (PRW).

First, Ms. Curry was originally injured in a car accident on April 1, 200. Thereafter she suffered significant pain, diminished reflexes, marked weakness and hyperesthesia. She was diagnosed with a herniated disc at C4–5 and radiculopathy (R. 246). Ms. Curry was hospitalized from July 19 through 21, 2000 where she underwent a cervical discectomy and fusion (R. 163–166). Also due to this accident, Ms. Curry suffered a tear of her right shoulder rotator cuff (R. 116). She underwent surgery for this impairment at Paoli Hospital and was admitted from July 23 through July 26, 2001 (R. 115, 273, 339–353). Thereafter Ms. Curry's symptoms from her neck returned. She was suffering from diminished reflexes and cervical pain. She was diagnosed with herniated discs at C6 and C7 with C6 and C7 radiculopathy (R. 15). She was admitted to the hospital again for another cervical discectomy and fusion from May 25 through May 29, 2001 (R. 358).

These numerous hospitalizations obviously would impact upon Ms. Curry's ability to work on a regular and continuing basis. SSR 96–8p. However, the ALJ never considered these limitations in assessing Ms. Curry's RFC.

However, in assessing a RFC, the Commissioner must consider the claimant's physical abilities which includes the claimant's ability to work on a regular and continuing basis. The regulations defining an individual's RFC specifically direct that a determination be made whether or not an individual can work on a regular and continuing basis. 20 C.F.R. Regulations No. 4, Subpt. P, § 404.15 45(b). Social Security Rulings define regular and continuing basis as follows:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day for 5 days a week, or an equivalent schedule.

SSR 96–8p; 96–9p. *Scannapieco v. Chater*, 1995 WL 613096 (E.D.Pa.1995), Padova, J., quoting *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, (3d Cir.1988) (holding that an ALJ's determination that a claimant could perform light work was not supported by the medical evidence when the treating doctor found a RFC for the claimant with the following limitations: sit for three hours, stand/walk for three hours, lift/carry 25 pounds, and occasionally climb and balance); *Boston v. Chater*, 1995 WL 708552 (E.D.Pa.1995), Padova, J.; *Kangas v. Bowen*, 823 F.2d 775 (3rd Cir.1987)(remanding case where ALJ failed to evaluate claimant's frequent hospitalizations or his ability to work on a "regular and continuing basis.")

### III. *Conclusion.*

Because the ALJ did not properly evaluate Dr. Der Krikorian's medical records and failed to properly evaluate Ms. Curry's RFC, this court reverses the Commissioner's final decision and **REMANDS** her case to the Commissioner for payment of DIB.

An appropriate Order follows.

### *ORDER*

**AND NOW**, this 25th day of February, 2003, upon consideration of the Cross Motions for Summary Judgment, it is hereby **ORDERED** that:

1. Defendant's Motion for Summary Judgment is **DENIED**;

2. Plaintiff's Motion for Summary Judgment is **GRANTED**;

3. The decision of the defendant is **REVERSED**; and

4. This case is **REMANDED** to the defendant for purposes of paying benefits to plaintiff in accordance with the judgment of this court. Such payment is to be made within a reasonable period of time.