NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2296
_____

TOWANDA UNDERDUE THOMAS,
                                                        Appellant

v.

COMMISSIONER SOCIAL SECURITY
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-19-cv-0570)
District Judge:  Hon. John M. Vazquez
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 13, 2021

Before:  CHAGARES, JORDAN, and SCIRICA, *Circuit Judges.*

(Filed:  May 20, 2021)
_____

OPINION*
_____

---

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Towanda Underdue Thomas applied for disability benefits based on the symptoms of her multiple sclerosis ("MS"). Thomas's MS affects her gait, eyesight, and levels of fatigue, as well as her mental health. The administrative law judge ("ALJ") denied her application for benefits, having found that she was capable of sedentary work during the relevant period. The ALJ relied on her medical record, her education, her daily efforts caring for her ill husband and two special-needs children, and reports by state medical consultants. On appeal, the District Court concluded that the ALJ's decision was supported by substantial evidence. Although Thomas faces a severely daunting daily routine, made even more challenging by her MS, the record provides enough support for the ALJ's conclusion, so we must affirm.

## I.    BACKGROUND

Thomas was born in 1968 and started experiencing MS symptoms in her twenties. She went on to obtain master's degrees in teaching and journalism, to work as a reporter for fifteen years, and to teach English for seven more years, until 2013. She also began an online doctoral-level degree as an education specialist in 2009 and completed the degree in 2017. In 2011, she was diagnosed with MS.[1] The following year, she began

---

[1] As the District Court explained, MS is characterized by:

> a body's own immune system attack[ing] the … protective sheath that covers nerve fibers. There is no cure. The signs and symptoms can vary drastically as can … the manifestations. It can be so severe that a person can't walk due to the nerve damage, and then at the same time certain persons will go through extended period with apparent remission. So the disease itself can be disabling in certain persons and not

taking medication for her condition, while still working, and increased her medication in 2013 to address inflammation causing damage to the optic nerve in her right eye.

Also in 2013, Thomas decided to leave her job to care for her husband, who was incapacitated by Parkinson's disease and dementia. Medicaid paid her as a full-time caregiver.[2] She also cared for their two teenage children, both of whom have special needs. The care Thomas provides her family is significant, continuous, and out of necessity. She bathes her husband, cooks for him, feeds him, and does his laundry, though she reported difficulties making meals and required help with the laundry. As could be expected, taking care of her family leaves her seriously fatigued.

Between 2013 and 2015, Thomas saw numerous doctors to whom she described numbness and tingling in her hands and feet, related to MS. In August 2013, a neurologist concluded that she had no neurological deficits, and in June 2014, another neurologist found the same. In November of 2014, her primary care physician, Dr. Marina Alexandrova, noted "mild unsteadiness" in Thomas's walking and described her MS symptoms as "very mild[.]" (AR at 569, 572.) In February of 2015 Dr. Alexandrova noted that Thomas was "upset about … having MS and her husband being very ill with [Parkinson's,]" and so the doctor started her on depression medication. (AR at 573.)

---

disabling in other persons, or it could be not disabling for extended periods.

(App. at 22-23.)

[2] She was paid by the New Jersey State-Medicaid Division's Personal Preference Program.

Thomas filed an application for disability insurance benefits on March 31, 2015, alleging that her disability began on August 2, 2013.  In April 2015, her physician confirmed her MS diagnosis and noted effects on her vision.  In May 2015, New Jersey's Disability Determination Services ("DDS") sent Thomas to be examined by a psychiatrist, who described her as "alert" and "oriented[,]" with "cognitive functions … intact" and "no memory deficits."  (AR at 562, 567.)  Thomas also demonstrated a "normal heel to toe gait," "normal tone and strength [in her] upper extremities and lower extremities[,]" and normal reflexes.  (AR at 563.)  In June and September 2015, two medical consultants for DDS reviewed Thomas's medical record and determined that she could perform light work.  Then, in November 2015, at the direction of DDS, Thomas underwent a psychiatric examination and complained of impaired vision but said that she makes do.  That psychiatrist observed good hygiene, grooming, and posture, a cooperative attitude, and "somewhat impaired" gait.  (AR at 607.)  "Conversations were clear and goal directed" and Thomas knew personal and current information, had the ability to concentrate, had a normal IQ, and had good motivation and effort.  (AR at 607.) Around that same time, she reported that she was able to exercise on a bike at home for forty-two minutes each day.

Also in November 2015, Dr. Alexandrova completed an assessment of Thomas's residual functional capacity ("RFC"), concluding that, due to MS, she had no ability to sit, stand, or walk for any amount of time throughout the day, that she could walk less than one city block, could not lift any weight, would need breaks every 15 to 30 minutes in an eight-hour work-day, had five to ten percent capacity to manipulate her arms,

4

fingers, and hands, and more generally "c[ould] not work." (AR at 611 (emphasis in original).)

In December 2015, Thomas reported to a neurologist that she was "doing ok" despite some fatigue. (AR at 617.) The neurologist referred her to physical therapy, which she attended later that year and was assessed as having the "main functional limitations [of] increased fatigue with activity and weakness to [lower extremities]." (AR at 635.) In July 2016, she mentioned to that neurologist that her "mental stamina is poor." (AR at 726.) In the fall of 2016, a new neurologist diagnosed her with "[MS], [u]nspecified abnormalities of gait and mobility[,] [m]ood disorder due to known physiological condition with depressive features [and] fatigue[,]" but described her MS symptoms as mild. (AR at 670.) An MRI of her spine at that point revealed no change in the plaque in her upper thoracic spine and other lab tests between 2012 and 2016. A few months later, in February 2017, Thomas noted increased fatigue and gait challenges, and in April 2017, she was hospitalized for fainting. In May 2017, she began seeing a therapist for depression.

Thomas's application for disability benefits was denied on July 1, 2015 by the Social Security Administration ("SSA"), as was her motion to reconsider four months later. A hearing was held before an ALJ in October 2017, and he found Thomas capable of sedentary work and therefore not entitled to benefits. The relevant period for her claim is between her August 2013 alleged onset date and the date of the ALJ's October 2017 decision. The SSA's Appeals Council concluded there were no grounds for review, and

the District Court similarly denied relief, deciding that substantial evidence supported the ALJ's decision. This appeal followed.

## II.    DISCUSSION[3]

Thomas challenges the ALJ's conclusion that, during the relevant period, she had an RFC sufficient to permit her to work forty hours each week in a sedentary capacity. She argues that the ALJ inappropriately relied on the reports of medical consultants, the ALJ's own lay speculation, and Thomas's "heroic, daily efforts to care for herself and her disabled family members[,]" all while discounting the opinion of Thomas's treating physician. (Opening Br. at 14.)

Title II of the Social Security Act provides benefits to people who have contributed to the program and have a disability. 42 U.S.C § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" *Id.* at § 423(d)(1)(A). Thomas is disabled "only if" her impairment is so severe that she not only cannot complete her "previous work but cannot, considering

---

[3] The District Court had subject matter jurisdiction under 42 U.S.C. § 405(g) and we have jurisdiction under 28 U.S.C. § 1291. "We review the ALJ's decision under the same standard of review as the District Court, to determine whether there is substantial evidence on the record to support the ALJ's decision." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1153-54 (2019) ("Substantial evidence is 'more than a mere scintilla' and means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (citation omitted)).

[her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* at § 423(d)(2)(A).

To make that decision, the SSA, acting through its ALJs, follows a five-step analysis. 20 C.F.R. § 404.1520(a)(4). First, the ALJ considers whether the claimant is engaged in any substantial gainful activity. *Id.* at § 404.1520(a)(4)(i). If not, at step two, the ALJ analyzes the severity of the claimant's impairments. *Id.* at § 404.1520(a)(4)(ii). At step three, the ALJ compares the claimant's severe impairments to a list of impairments "presumed severe enough to preclude any gainful work." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999) (citation omitted); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment is not listed, the ALJ considers whether the claimant retains the RFC to perform her past relevant work at step four. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can return to her past relevant work, she is not disabled. *Id.* Should the claimant successfully demonstrate that she is unable to return to her past relevant work, the fifth step requires the ALJ to determine whether the claimant's impairment precludes her from adjusting to other work. *Id.* at § 404.1520(a)(4)(v). The ALJ classifies the type of work the claimant may do based on physical exertion requirements, ranging from sedentary work to very heavy work. *Id.* at § 404.1567.

Here, the ALJ found, at step one, that, although she received some compensation from the state for caring for her disabled husband, Thomas had not engaged in substantial gainful activity since August 2, 2013, the onset date. He then found, at steps two and three, that she suffered from severe impairments consisting of MS, optic neuritis, and adjustment disorder secondary to her medical condition, but that she "does not have an

impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (App. at 38.)   At step four, the ALJ found that she "has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a)" with some limited additional physical capabilities.  (App. at 39.)  He required that she be given "ready access to a bathroom with no exposure to unprotected heights or hazardous machinery" and concluded that she has "sufficient visual acuity to handle and work with any size object and would be able to read any normal size print."  (App. at 39, 42.)  The ALJ considered her medical record, giving "substantial weight" to the state consultants' assessments, which limited Thomas to light work, a step above sedentary work.  (App. at 40.)  The ALJ found that assessment consistent with the record and with the fact that Thomas's "objective tests support mostly normal functioning."  (App. at 40.)  He then gave only partial weight to Dr. Alexandrova's November 2016 RFC assessment that Thomas had no capacity to work, because Thomas's "treatment and activities suggest much higher functioning" than that assessment would permit.  (App. at 42.)  Moreover, the ALJ noted that her high level of activity was a cause of her fatigue.  Thus, he found her capable of sedentary work.

"In making a residual functional capacity determination, the ALJ must consider all evidence before him."  *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).  Thomas argues that the ALJ failed to do so, instead seizing on her "plucky, unwavering devotion and 'no other choice' dedication to her mentally and physically dependent family[,] … reject[ing] the only treating [physician's opinion on RFC,] …

8

while giving substantial weight to nonexamining, purportedly 'neutral' DDS physicians[.]" (Opening Br. at 20.)

To demonstrate that the ALJ drew inappropriate conclusions from her daily caregiving efforts, Thomas focuses on segments of her testimony that the ALJ allegedly disregarded, for example, that her brother-in-law folds laundry bi-weekly, she cannot cook a full meal, her right eye is occasionally blurry, her back is stiff, and her hands are partially numb. She acknowledges that the ALJ could consider her daily activities but contends that, in so doing, he failed to account for the "how, when, how well, how often, under what circumstances and with whose help th[o]se activities are undertaken[.]" (Opening Br. at 31.) The District Court rejected that argument, saying that the ALJ did not engage in "cherry-picking." (App. at 21.) We agree. In reaching his conclusion, the ALJ comprehensively summarized and characterized Thomas's medical history, as well her daily routine, including noting the difficulties she faced. *See Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) (the ALJ must "consider and evaluate the medical evidence in the record," but is not expected "to make reference to every relevant treatment note."). Although it does not change the outcome of Thomas's appeal, we certainly agree with the District Court that her daily responsibilities "make[] her … akin to Atlas holding up the world." (App. at 21.)

Thomas next argues that the ALJ should have relied more extensively on Dr. Alexandrova's November 2015 assessment, as well as excerpted findings from other doctors that she claims are consistent therewith. She also suggests that the state consultants' RFC assessments should have been given less weight because those

9

consultants did not have access to Dr. Alexandrova's 2015 RFC assessment when they completed their reviews. And she asks that we rely on *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000), in which we reversed an ALJ's decision because it improperly relied on lay speculation and an expert who did not have access to the full record. *See id.* at 320 ("[I]t is well established that the opinions of a doctor who has never examined a patient 'have less probative force as a general matter, than they would have had if the doctor had treated or examined him.'" (citation omitted)).

In this case, however, the ALJ was within proper bounds in assessing Dr. Alexandrova's opinion, giving it partial weight, and reaching a conclusion consistent with the record as a whole. Unlike in *Morales*, there is no "overwhelming evidence to the contrary [of the ALJ's RFC] in the record." *Id.* The record, instead, adequately supports the ALJ's conclusion that Thomas had the ability to complete sedentary work, based on the reviews completed by state medical consultants, her success in achieving an online doctorate level degree, and her own testimony about the daily care and maintenance she provides to her husband, children, and household. Additionally, during the relevant period every medical report besides Dr. Alexandrova's November 2015 assessment described her symptoms as mild. This is consistent with the fact that, from 2012 to 2016, Thomas's back and brain scans showed little change. Even Dr. Alexandrova described Thomas's symptoms as mild in late 2014. We therefore agree with the District Court and the ALJ that Thomas's "treatment and activities suggest much higher functioning" than is described in Dr. Alexandrova's second report. (App. at 23, 42.) *Cf. Fargnoli*, 247 F.3d at 42 ("Where there is conflicting probative evidence in the

10

record, we recognize a … need for an explanation of the reasoning behind the ALJ's conclusions[.]"). "The ALJ also noted that the record was consistent with the [state consultant] opinions[,]" and we further agree with the District Court that he appropriately relied on those reports. (App. at 24.)

Lastly, Thomas argues that the ALJ's RFC determination failed to appropriately address her physical and mental limitations. Again, we agree with the District Court that it was "appropriate for [the] ALJ to [ask] what can [Thomas] do on a daily basis." (App. at 26.) With that question in mind, the ALJ justifiably concluded, in light of "her activities, including taking care of her family and household duties," that Thomas "can occasionally, climb ramps and stairs, occasionally, stoop, knee[l], crouch, balance, and crawl[,]" while performing sedentary work. (App. at 41.)

Thomas deserves the utmost respect for her perseverance in the face of extraordinary odds. Our commission, however, is very limited in cases like this. The only question we are to answer is whether substantial evidence supports the ALJ's decision. It does.

## III. CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment.

11