NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2517
_____

CAROLYN BECKER,
                                    Appellant

v.

COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-08-cv-01873)
District Judge:  Hon. Gene E.K. Pratter
_____

Submitted Under Third Circuit LAR 34.1(a)
December 13, 2010

Before:  RENDELL, JORDAN and HARDIMAN, *Circuit Judges*.

(Filed: December 14, 2010)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Carolyn Becker appeals from an order of the United States District Court for the

Eastern District of Pennsylvania affirming the decision of an Administrative Law Judge

("ALJ") to deny Becker's claim for disability insurance benefits. For the following reasons, we will affirm.

## I. Background

On September 1, 2005, Becker filed for benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f, based on her alleged inability to work since March 17, 2005. After her initial claim was denied, Becker requested a hearing, which was held before an ALJ on May 3, 2007.

The administrative record sets forth Becker's employment and medical history. She was a high school graduate who had worked as a waitress, a reservation clerk, and, most recently, as a telephone operator. Her job as a telephone operator mostly entailed sitting for seven hours while responding to phone calls, with about one hour of intermittent standing and walking in connection with routine office tasks like retrieving faxes. During the five years that she worked as a telephone operator, Becker reported frequently missing work because of difficulty with sitting or standing for long periods of time. Becker was laid off from that job in March 2005.

In April 2005, Becker had her knees x-rayed, which revealed mild to moderate osteoarthritis in both knees. Later in April 2005, after complaining of difficulty with prolonged standing and walking, Becker was found to have a cartilage click and medial joint line pain in her right knee. A subsequent MRI of Becker's right knee in May 2005

showed severe degenerative changes and evidence of chondromalacia involving the patella.[1]

In June 2005, Becker was evaluated by Dr. Randall Smith, an orthopedic surgeon. Becker complained to Dr. Smith of pain in both her knees and lower back, and Dr. Smith noted that Becker's right knee was swollen and was painful and noisy during joint movement. Dr. Smith also reviewed Becker's x-ray and MRI studies and noted in the right knee the same extensive degenerative changes and chondromalacia that had been observed before, along with milder versions of the same conditions in Becker's left knee. In a post-evaluation letter to Becker's primary care physician, Dr. Melanio Aguire, Dr. Smith described Becker as "very active, working, caring for her 6-year-old child, and so forth" and recommended that Becker exercise, lose weight, and "find a sit-down type job." (App. 2 at 18, 125, 239, 240.) Dr. Smith also suggested that Becker might benefit from knee joint injections or arthroscopic knee surgery, though he thought that simpler means like pain medication and supportive knee braces would enable Becker to function at a "decent" level. (App. 2 at 125, 240.)

The next month, in July 2005, Becker had follow-up examinations with Dr. Smith, during which she reported that she had been working on her feet and experiencing pain in her lower back, knees, and feet, none of which was relieved by the medication she had

---

[1] "Chondromalacia patella is the softening and breaking of the tissue (cartilage) that lines the underside of the kneecap (patella)." Medline Plus, A service of the U.S. National Library of Medicine and National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/000452.htm (last visited Nov. 19, 2010).

been taking. Dr. Smith performed knee injections, encouraged Becker to exercise and lose weight, prescribed Oxycontin and Percocet for the pain, and suggested that Becker have arthroscopic surgery on her right knee if the pain continued. Dr. Smith also noted that Becker should be able to perform "limited duty" work.

In August 2005, Becker had MRIs on her back and left knee. The back MRI revealed a small annular disc bulge and central disc protrusion but no lateral disc herniation. The left knee MRI revealed mild chondromalacia and a small cyst but no internal derangement of the knee joint or signs of a ligament or meniscus tear.

Another month later, in September 2005, Dr. Smith found that Becker was still suffering from chrondomalacia of the knees, with swelling and noisy joint movement, but noted that Becker had "decent" range of motion and good stability in her knees. (App. 2 at 226.) He also noted that the pain control regimen of Oxycontin and Percocet was helping. Dr. Smith nevertheless concluded that Becker should perform "no work" for an unspecified period. Having learned of Becker's condition from Dr. Smith, Dr. Aguire completed a form certifying that Becker was eligible for public welfare benefits due to temporary incapacity resulting from her knee problems.

In mid-October 2005, Dr. Aguire reported to the Social Security Administration that Becker exhibited full motor power and normal range of motion in her arms and legs and no symptoms of any emotional or cognitive disorders. Becker herself reported to the Social Security Administration that she had given up bike riding, jogging, aerobics, and basketball but that she could still do household chores such as laundry, dishes, and light cleaning. While noting that knee pain required her to change positions frequently from

4

sitting to standing, Becker also reported being able to climb a flight of stairs four or five times per day, walk two blocks, and lift 10 pounds.

Around that same time, Dr. Smith reported to Dr. Aguire that Becker was still experiencing pain in her knees and back and was also suffering from cramps in her calves that disrupted her sleep. Dr. Smith further reported that Becker had painful range of motion in both of her knees and great difficulty in ambulation. Dr. Smith indicated that he had completed social security paperwork for Becker, having concluded that, in her then-condition, Becker "obviously [could] not be working." (App. 2 at 222.)

In late-October 2005, Dr. Yasser Gouda examined Becker's knees, calves, and feet. During Dr. Gouda's examination, Becker demonstrated normal leg muscle strength and was able to ambulate without any assistive device and to do toe-walking, heel-walking, and squatting without limitations.

In November 2005, Dr. Smith reported to Dr. Aguire that he was going to prescribe anti-depressants for Becker, and he recommended that she receive counseling to deal with her chronic pain. Dr. Smith also shared that, while he believed that exercise, weight loss, and medication could be somewhat helpful, he did not think that Becker would be able to return to work, then or in the future, and that, due to her chronic back and leg problems, she would "have to be careful about her activity levels." (App. 2 at 210.)

In December 2005, a state physician reviewed Becker's medical records, including Becker's MRI studies and the report from Dr. Aguire, along with Becker's reported daily functionality. From that review, the physician concluded that Becker could lift no more

than 20 pounds occasionally and less than 10 pounds frequently; stand and walk for at least two hours in an eight-hour day; and sit for about six hours in an eight-hour day.

In March 2006, Dr. Smith reported to Dr. Aguire that Becker's previously-diagnosed conditions were still causing her pain in her knees and back. Dr. Smith noted, however, that the pain medication, used in conjunction with knee braces and a walking exercise program, seemed to be working and that Becker still had "decent range of motion and good stability" in her knees. (App. 2 at 197.) Dr. Smith noted similar findings in June and September 2006, describing the pain medication as "improving and stabilizing overall activity levels," even though Becker's physical condition was "unchanged." (App. 2 at 184.)

In August 2006, Becker met with mental health professionals. She reported that she had started to feel depressed three months earlier and anxious about one year earlier. She acknowledged that anti-depressant and anti-anxiety medication prescribed by Dr. Aguire had helped her. Becker denied experiencing any symptoms of depression or anxiety at that time and, despite being intermittently tearful during the meeting, her affect was full and appropriate. She was diagnosed at that time with major depressive disorder, single episode, in partial remission, with her psychological functioning rated as only moderately impaired.[2] The psychiatrist who conducted Becker's initial evaluation,

---

[2] Becker was assessed using the Global Assessment of Functioning ("GAF") and received a score of 60. A GAF score from 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers).

Dr. Neal Gansheroff, prescribed anti-depressant and anti-anxiety medications. It does not appear that Dr. Gansheroff modified those prescriptions during the course of Becker's treatment.

Becker had a follow-up visit with Dr. Gansheroff in September 2006. He reported that Becker exhibited mild anxiety and some tearfulness but otherwise had a full affect and situationally-appropriate emotions, with judgment, insight, and memory intact. He diagnosed Becker with major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder, and again rated Becker's psychological functioning as only moderately impaired.[3]

In December 2006, Dr. Smith and Dr. Gansheroff responded to interrogatories from Becker in connection with her disability claim, with Dr. Gansheroff also providing a medical source statement rating Becker's impairment under the Social Security Administration's listing for affective disorders.[4] Noting chronic pain in Becker's knees and lumbar spine, Dr. Smith opined that Becker could sit with her knees bent at a 90 degree angle for 30 minutes at a time for a total of two hours and could stand for 30 minutes at a time for a total of 30 to 60 minutes in an eight-hour day without severe pain. Dr. Smith estimated that Becker could lift and carry 10 pounds several times an hour throughout the course of an eight-hour day but noted that prolonged standing, walking, or

---

[3] Becker's GAF score from that examination was 55.

[4] The interrogatories concerning Becker's mental condition were directed to Dr. Gansheroff and therapist Jennifer Cummings, who identified herself as a student intern. For brevity's sake, we treat the interrogatories and the responses thereto as being directed to and answered by Dr. Gansheroff. We likewise treat the medical source statement as being created by Dr. Gansheroff.

sitting would cause moderate to severe pain. He concluded that Becker would be likely to miss more than two days per month at a simple, unskilled, sedentary job and opined that Becker's prognosis for improvement was poor.

Dr. Gansheroff indicated in his response to the interrogatories that Becker reported being slightly better in December 2006 than she was in April 2005 after the loss of her job but that she nevertheless met four of the criteria for a manic syndrome diagnosis. He also indicated that Becker would be likely to miss more than two days per month at a simple unskilled sedentary job and that her prognosis for improvement was uncertain. In the medical source statement, Dr. Gansheroff checked boxes indicating that Becker was "Markedly Limited"[5] in various areas affecting her ability to work, including remembering locations and work-like procedures; understanding and remembering detailed instructions; maintaining attention and concentration for extended periods; interacting appropriately with the general public; traveling to unfamiliar places or using public transportation; and setting realistic goals or making plans independent of others. Dr. Gansheroff further opined that Becker had a substantial loss of ability to understand, remember, and carry out simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in the routine work

---

[5] The medical source statement defines "Markedly Limited" as "[a]n impairment which precludes the individual's ability to function independently, appropriately, and effectively in the designated area on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent work schedule." (App. 2 at 258.) "Moderately Limited" is defined as "[a]n impairment which seriously interferes with, and in combination with one or more other restrictions assessed, may preclude the individual's ability to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." (*Id.*)

setting. He indicated that Becker had had, or could at least be expected to have, those limitations for 12 continuous months.

At the May 3, 2007 hearing before the ALJ, Becker testified that her daily activities were limited to house cleaning. She indicated that she could walk two blocks, stand for 30-60 minutes, sit for 30 minutes, and lift 8-10 pounds but that she needed to lie down periodically throughout the day.

Also at the hearing, the ALJ asked a vocational expert to testify regarding the work prospects of a hypothetical person resembling Becker. The hypothetical person was between 39 and 41 years old; had a high school education; had worked as waitress, reservation clerk, and telephone operator; could do no more than sedentary work; required occasional postural changes; and needed to avoid crawling, kneeling, and temperature extremes. The vocational expert testified that there were hundreds of jobs regionally and thousands of jobs nationally that the hypothetical person could perform. That held true, the vocational expert said, even if it was assumed that the hypothetical person required a job that allowed for a sit/stand option; had a low stress work-setting; featured routine, repetitive tasks; and required understanding, remembering, and following only simple instructions.

After considering the foregoing, the ALJ denied Becker's claim on May 21, 2007. Working through the five-step regulatory analysis,[6] the ALJ found that Becker had not

_____

[6] At step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. If so, the claimant is not disabled, and the inquiry ends. At step two, the ALJ considers whether the claimant suffers from a severe medical impairment. If not, the claimant is not disabled, and the inquiry ends. At step three, the ALJ considers whether

9

engaged in substantial gainful activity since her alleged onset date and that she had impairments, including bilateral degenerative joint disease/chondromalacia patella/arthritis, degenerative disc disease in her lumbar spine, obesity, depression, and anxiety. However, the ALJ also found that Becker's impairments were not equivalent to those listed under the regulations; that her residual functional capacity of being able, with periodic breaks, to walk, sit, stand, and lift 10 pounds enabled her to perform sedentary work with occasional postural changes; and that jobs of that kind were available in the regional and national economy. In reaching that conclusion, the ALJ noted that Dr. Gansheroff's assessing of Becker as "Markedly Limited" was neither explained nor supported by the treatment records, which indicated that Becker's psychological impairments were only moderate. The ALJ further noted that the pain medications had helped Becker without any material side effects and that she still was able to perform tasks requiring limited sitting, standing, and walking. The ALJ gave only limited weight to Dr. Smith's interrogatory responses, reasoning that they were not supported by his treatment records. Becker's request for further review was denied on March 27, 2008.

---

the impairment is equivalent to those listed in 20 C.F.R. Part 404, subpart P, Appendix 1. If it is, the claimant is considered presumptively disabled, and the inquiry ends. If not, the inquiry moves on to step four. At step four, after assessing the claimant's residual functional capacity ("RFC"), the ALJ considers whether that RFC enables the claimant to perform past relevant work. If it does, the claimant is not disabled, and the inquiry ends. Finally, at step five, the ALJ considers whether, based on the claimant's RFC, age, education, and work experience, there is sufficient work available in the national economy. If so, the claimant is not disabled. Otherwise, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4).

On April 21, 2008, Becker sought review in the District Court. The District Court assigned the matter to a magistrate judge, who issued a report and recommendation in January 2009, recommending that the ALJ's decision be affirmed. On July 17, 2009, the District Court adopted in part and rejected in part the report and recommendation and referred the matter back to the magistrate judge for further consideration of Dr. Smith's assessments and conclusions regarding Becker's functional limitations. After considering Dr. Smith's assessments and conclusions, the magistrate judge concluded that they were too inconsistent to be "afforded controlling weight" (App. 1 at 50) and issued a supplemental report and recommendation again recommending that the ALJ's decision be affirmed. On March 22, 2010, the District Court approved and adopted the supplemental report and recommendation and ordered the case closed.

Becker timely appealed.

## II.     Discussion[7]

When reviewing a District Court's affirmance of an ALJ's denial of benefits, we exercise plenary review of the District Court's legal decisions. *Allen v. Barnhart*, 417 F.3d 396, 397 (3d Cir. 2005). Like the District Court, we review the ALJ's factual findings only to determine if they are supported by substantial evidence. *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as

---

[7] The District Court had jurisdiction to review the Social Security Administration's decision pursuant to 42 U.S.C. § 405(g), and we have jurisdiction pursuant to 28 U.S.C. § 1291.

11

adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted)). To ensure meaningful review, the ALJ must discuss "the evidence he considered which supports the result" and "the evidence which was rejected," *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), and should give his reasons for accepting only some evidence while rejecting other evidence, *see id.* (noting that the ALJ should "explain[] the weight he has given to obviously probative exhibits"). Where the ALJ's findings of fact are supported by substantial evidence, a court is bound by those findings, even if the court would have decided the factual inquiry differently. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). The court looks at the whole record in making such determination. *See Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981) (noting that the court "must scrutinize the record as a whole").

Becker's principal contention on appeal is that the ALJ's decision was not supported by substantial evidence because the ALJ improperly rejected the opinions of Dr. Smith and Dr. Gansheroff regarding Becker's residual functional capacity.[8] We disagree.

"A cardinal principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged

---

[8] Becker also argues that the District Court erred by affirming the ALJ's decision based on facts that the ALJ did not cite and that, when viewed as part of the whole record, did not amount to substantial evidence. We need not address that argument, however, because we are independently reviewing the ALJ's decision.

12

period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). However, "where … the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit" and may reject the treating physician's assessment if such rejection is based on contradictory medical evidence. *Id.* Similarly, under 20 C.F.R. § 416.927(d)(2), the opinion of a treating physician is to be given controlling weight only when it is well-supported by medical evidence and is consistent with other evidence in the record.

Here, the ALJ rejected Dr. Gansheroff's opinion of marked limitation because it contradicted his own treatment records, which indicated Becker's mental limitations as only moderate. Likewise, the ALJ rejected Dr. Smith's interrogatory responses and conclusions regarding Becker's ability to work because they contradicted his own treatment records, which indicated that Becker had responded positively to medication and treatment and could sit, stand, walk, and lift to some degree. Dr. Smith's interrogatory responses were also contradicted by Dr. Gouda, Dr. Aguire, and even Becker herself, all of whom either documented or testified that Becker was able to ambulate and perform various light activities for periods of time without severe pain. Thus, the ALJ could properly reject parts of the opinions of Dr. Smith and Dr. Gansheroff.

We also conclude that the ALJ's decision regarding residual functional capacity is supported by substantial evidence. The physicians' treatment records, along with Becker's own statements, indicate that medication had stabilized and improved Becker's

13

overall activity levels and that, with periodic breaks, she could sit, stand, and walk and could lift and carry 10 pounds. The ALJ did not err, then, in finding that Becker had the residual functional capacity to perform sedentary work.[9]

### III. Conclusion

For the foregoing reasons, we will affirm the District Court's order upholding the ALJ's decision denying Becker's claim for disability insurance benefits.

---

[9] Becker does not challenge the other aspects of the ALJ's decision.