Cathy Renee GALLO, Plaintiff,

v.

Carolyn COLVIN, Acting
Commissioner of Social
Security, Defendant.

Civil Action No. 4:15–CV–0167

United States District Court,
M.D. Pennsylvania.

Signed May 13, 2016

Katherine L. Niven, Law Office of Katherine L. Niven & Associates, PC, Harrisburg, PA, for Plaintiff.

D. Brian Simpson, United States Attorney's Office-Social Security Divis, Harrisburg, PA, for Defendant.

## ORDER

Matthew W. Brann, United States District Judge

### I. Introduction [1]

Plaintiff, Cathy Renee Gallo, hereinafter "Gallo," filed a complaint [2] in this Court after the Acting Commissioner of Social Security, Defendant Carolyn Colvin, hereinafter "the Commissioner," denied her application for supplemental security income benefits.

---

1. Because the Court writes only for the parties, the full factual history is omitted, with the understanding that the parties are intimately familiar with the facts of the case.

2. January 23, 2015, ECF No. 1.

The action was jointly assigned to Magistrate Judge Gerald B. Cohn, who issued a thorough, thirty-page report and recommendation[3] on January 20, 2016. He recommended that the Commissioner's decision be reversed and the action remanded to the administrative law judge.

Both Gallo and the Commissioner briefed responses to the magistrate judge's report and recommendation. The Court respectfully disagrees with the recommendation of the magistrate judge and will affirm the decision of the Commissioner denying Gallo supplemental security income benefits.

## II. Discussion

Upon designation, a magistrate judge may "conduct hearings, including evidentiary hearings, and ... submit to a judge of the court proposed findings of fact and recommendations."[4] Once filed, this Report and Recommendation is disseminated to the parties in the case who then have the opportunity to file written objections.[5] When objections are timely filed, the district court must conduct a de novo review of those portions of the report to which objections are made.[6] Although the standard of review for objections is de novo, the extent of review lies within the discretion of the district court, and the court may otherwise rely on the recommendations of the magistrate judge to the extent it deems proper.[7]

For portions of the report and recommendation to which no objection is made, the Court should, as a matter of good practice, "satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."[8] Regardless of whether timely objections are made by a party, the district court may accept, not accept, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.[9]

To evaluate disability insurance and supplemental security income claims, the Commissioner and administrative law judge utilize a five-step process.[10] This process requires the Commissioner, and the administrative law judge, to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.[11]

The Commissioner affirmed the decision of the administrative law judge, who had held at step three that Gallo did not have an impairment or combination of impairments that meet or equal a listing; decid-

---

3. ECF No. 18.

4. 28 U.S.C. 636(b)(1)(B).

5. 28 U.S.C. 636(b)(1).

6. 28 U.S.C. § 636(b)(1); *Brown v. Astrue,* 649 F.3d 193, 195 (3d Cir.2011).

7. *Rieder v. Apfel,* 115 F.Supp.2d 496, 499 (M.D.Pa.2000) (*citing United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)).

8. Fed.R.Civ.P. 72(b), advisory committee notes; *see also Univac Dental Co. v. Dentsply Intern., Inc.,* 702 F.Supp.2d 465, 469 (M.D.Pa. 2010) (*citing Henderson v. Carlson,* 812 F.2d 874, 878 (3d Cir.1987) (explaining that judges should give some review to every report and recommendation)).

9. 28 U.S.C. § 636(b)(1); Local Rule 72.31.

10. *See* 20 C.F.R. § 416.920.

11. *Id.*

ed at step four that Gallo has the residual functional capacity to perform less than the full range of sedentary work; and found at step five that there are jobs in the national economy that she could perform.

The magistrate judge found that the administrative law judge erred in two respects. First, that he relied on a single state agency non-examining medical opinion, and second, that the administrative law judge conflated Gallo's physical impairments of neurogenic and vascular thoracic outlet syndromes. I disagree with both propositions.

■ The administrative law judge wrote that he gave "significant weight to the medical opinion[ ] of Dr. Vonah, who examined the claimant on multiple occasions;" significant weight to the impartial medical expert, Dr. Owens; moderate weight to "the medical opinions of Dr. Campbell and Dr. Karas, who treated the claimant on a limited basis;" and limited weight "to the non-examining opinions of the state agency psychological and medical consultants." [12]

■ The administrative law judge's statement of the weight given to the treating and non-treating physicians was more than just lip service. When I independently reviewed his written opinion supporting his decision, the weight given to each opinion is evident by the number of times he cited to each physician.[13] "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." [14] It is evident that the administrative law judge gave the most weight to Dr. Vonah, Gallo's primary care physician, as those treatment notes are the most frequently cited in his written decision.

The magistrate judge also suggested that the administrative judge erred by conflating Gallo's neurogenic and vascular thoracic outlet syndromes. I also disagree. The administrative law judge copied into his opinion the notes from Gallo's treating physicians. It is respectfully suggested that the magistrate judge, "impermissibly substituted his own judgment for that of a physician" [15] by engaging in his own analysis of Gallo's neurogenic and vascular symptoms based on his own internet research.[16]

■ Moreover, the magistrate judge intimated, without finding as such, that the administrative law judge erred for not having relied on the doctors' determination of disability. The magistrate judge wrote that "[a]lthough at least three medical opinions existed in Plaintiff's file at the time of the hearing, all indicating that she was disabled, the ALJ called an additional medical expert [ ]." [17] However, it is well settled in this circuit that "[t]he ultimate decision concerning the disability of a claimant is reserved for the Commissioner." [18]

**12.** Administrative Law Judge Opinion ECF No. 10–2 at 23.

**13.** *Id.* At 21–23.

**14.** *Morales v. Apfel,* 225 F.3d 310 (3d Cir. 2000).

**15.** *Burns v. Colvin,* 156 F.Supp.3d 579, 588, No. 1:14–CV–1925, 2016 WL 147269, at *1 (M.D.Pa. Jan. 13, 2016) (Kane, J.).

**16.** ECF No. 18 at 3 and 7.

**17.** Report and Recommendation, ECF No. 18 at 15.

**18.** *Knepp v. Apfel,* 204 F.3d 78, 85 (3d Cir.Pa. 2000), citing 20 C.F.R. § 404.1527(e) (1999).

## III. Conclusion

The report and recommendation of the magistrate judge is REJECTED. ECF No. 18. The decision of the Commissioner is AFFIRMED. The Clerk is directed to enter judgment in favor of the Commissioner and against the Plaintiff. The Clerk is further directed to close the case file.

## REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS

GERALD B. COHN, UNITED STATES MAGISTRATE JUDGE.

### I. Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Cathy Gallo ("Plaintiff") for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§ 401–433, 1382–1383 (the "Act"), and Social Security Regulations, 20 C.F.R. §§ 404 *et seq.*, 416 *et seq.* (the "Regulations").[1] Here, two state agency physicians and at least one treating source opined that Plaintiff suffered disabling limitations. One state agency physician opined that Plaintiff did not suffer disabling limitations. Since the Regulations were amended in 1991 to include standards for evaluating medical opinion, the Third Circuit has not affirmed, in a precedential opinion, any ALJ who rejects a treating physician opinion within only a single state agency non-examining medical opinion.

Here, relying on a single state agency non-examining medical opinion was an error. Plaintiff suffered from neurogenic thoracic outlet syndrome and vascular thoracic outlet syndrome. Vascular types of thoracic outlet syndrome involve compressed arteries or veins. Neurogenic types of thoracic outlet syndrome involve compressed nerves. In 2009 and 2010, Plaintiff was diagnosed with vascular and neurogenic thoracic outlet syndrome. In 2011, tests excluded vascular thoracic outlet syndrome, but Plaintiff's neurogenic symptomology was so severe that she still needed additional surgery. In 2012, tests again excluded vascular thoracic outlet syndrome, but physical examination indicated the continued presence of neurogenic thoracic syndrome. The state agency doctors who opined that Plaintiff was disabled acknowledged the difference between neurogenic and vascular symptoms. The state agency doctor who opined that Plaintiff was not disabled did not acknowledge the difference between neurogenic and vascular symptoms.

The only rationale provided by the ALJ to credit the single state agency reviewing opinion that Plaintiff was not disabled were medical records showing that Plaintiff's vascular thoracic outlet syndrome had resolved. The ALJ improperly conflated vascular and neurogenic thoracic outlet syndrome. Consequently, the ALJ failed to provide proper rationale to reject the multiple opinions that Plaintiff was disabled. The Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings.

### II. Procedural Background

On March 28, 2012, Plaintiff filed an application for SSI and DIB under the Act. (Tr. 143–59). On May 7, 2012, the Bureau

---

1. Part 404 governs disability insurance benefit applications and Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

---

of Disability Determination ("state agency") denied Plaintiff's application (Tr. 55–74), and Plaintiff requested a hearing. (Tr. 87–88). On August 8, 2013, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 29–54). On August 14, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 11–28). Plaintiff requested review with the Appeals Council (Tr. 7–10), which the Appeals Council denied on November 19, 2014, affirming the ALJ decision as the "final decision" of the Commissioner. (Tr. 1–6). *See Sims v. Apfel*, 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000).

On January 23, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On April 10, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On May 25, 2015, Plaintiff filed a brief in support of the appeal ("Pl.Brief"). (Doc. 12). On June 26, 2015, Defendant filed a brief in response ("Def.Brief"). (Doc. 14). On July 2, 2015, Plaintiff filed a brief in reply ("Pl.Reply"). (Doc. 15). On June 29, 2015, the case was referred to the undersigned Magistrate Judge. The matter is now ripe for review.

## III. Standard of Review and Sequential Evaluation Process

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *Id.* Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). *Id.*

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the deni-

al. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir.2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir.2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir.1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

## IV. Relevant Facts in the Record

Plaintiff was born on May 25, 1967 and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 23); 20 C.F.R. § 404.1563. Plaintiff has a ninth grade education and past relevant work as a supermarket flower manager. (Tr. 23). An initial application for benefits under the Act was denied on July 1, 2011. (Tr. 188).

Plaintiff injured her left wrist in April of 2008 at her job as a florist. (Tr. 282, 442–43). In May of 2008, an orthopedic surgeon performed a ganglion cyst removal. (Tr. 282). Plaintiff reported pain in her left elbow, and underwent a left ulnar nerve transposition in June of 2008. (Tr. 282). In March of 2009, Plaintiff indicated that she was "on leave of absence from work" due to multiple medical issues, including "elbow and arm issues." (Tr. 432). In June of 2009, one of Plaintiff's providers noted that Plaintiff "has been working full duty as a floral manager for a super market." (Tr. 440, 667–68). She reported leaving work "after 3–4 hours on a lot of days because of severe pain" in her left arm. (Tr. 440). The provider "wrote her a note stating that she should work her regular job as a floral manager four hours per day as a medical necessity." (Tr. 441). In June of 2009, Plaintiff was diagnosed with thoracic outlet syndrome, "both neurogenic and vasogenic." (Tr. 440).

Thoracic outlet syndrome is "a non specific label" for "upper extremity symptoms due to compression of the neurovascular bundle by various structures in the area just above the first rib and behind the clavicle." Diagnosis of thoracic outlet syndrome, Sanders, Richard J. et al., Journal of Vascular Surgery, Volume 46, Issue 3, 601—604 available at http://www.jvascsurg.org/article/S0741-5214_07.00734-3/abstract?cc=y= (last accessed January 7, 2016). "The initial presentation of thoracic outlet syndrome is dependent on whether the compression is primarily vascular, neurogenic, or a combination of both." http://emedicine.medscape.com /article/96412–clinical (last accessed January 7, 2016). "Vascular thoracic outlet syndrome is rare and can involve the subclavian artery or vein." *Id.* Neurogenic thoracic outlet syndrome is more common. *Id.* Symptoms of neurogenic thoracic outlet syndrome include: "neck and shoulder discomfort, headache, and paresthesia and/or weakness of the upper extremity. Paresthesia, particularly at night, is common and symptoms are usually more pronounced with the arm in an elevated or overhead position. Sensory abnormalities will characteristically involve the ulnar aspect of the hand or the medial portion of the forearm. Reynaud's phenomenon is a sympathetic response also frequently seen concurrently with [neurogenic thoracic outlet syndrome] and may be a consequence of an overactive sympathetic nervous system involving the nerve roots of C8, T1, and the lower trunk portion of the brachial plexus." Clinical

Brief: . Neurogenic Thoracic Outlet Syndrome, Jordan A. Gliedt, D.C. Clinton J. Daniels, D.C., M.S. Dennis E. Enix, DC, MBA, *Topics in Integrative Health Care* 2013, Vol. 4(3) ID: 4.3003; http://www.tihcij.com/Articles/ Clinical–Brief–Neurogenic–Thoracic–Outlet–Syndrome.aspx?id=0000405 (last accessed January 7, 2016).

In July of 2009, Dr. Avraam Karas,[2] M.D. diagnosed Plaintiff with "severe thoracic outlet syndrome of the left arm, neurogenic and vasogenic" and "early symptoms of thoracic outlet syndrome of the right arm." (Tr. 284, 676). Studies indicated an artery was compressed at the thoracic outlet on both sides. (Tr. 438). In September of 2009, Plaintiff underwent "surgical release" for thoracic outlet syndrome of her left arm with Dr. Karas, including a left rib resection. (Tr. 237–43, 276, 487–94). She had an "excellent response" and was released to work "without any restrictions" in October of 2009. (Tr. 273, 433, 436, 672–73).

In February of 2010, Plaintiff reported "doing fairly well" and "working quite a bit, lifting heavy boxes of flowers in cold weather which seems to be agitating symptoms on the right side." (Tr. 396, 604–08). She indicated that her "left side seems much improved post surgery." (Tr. 396). Dr. Vonah noted "[h]er whole goal is to try to get through until after the Mother's Day Holiday which is a big time for florists. If she can do that then she is thinking it may be a reasonable idea to get the thoracic outlet surgery on her right side." (Tr. 396).

Plaintiff had a history of breast cancer. (Tr. 434). In March of 2010, she returned to an oncologist, Dr. Sims, for follow-up. (Tr. 434, 669–70). Dr. Sims did not "find anything worrisome for malignancy" and instructed her to have mammograms regularly. (Tr. 435).

In June of 2010, Plaintiff presented to Dr. William Vonah, M.D., her primary care physician, because her right arm was numb. (Tr. 269, 387–89, 597-600). He prescribed Percocet and oxycodone and referred Plaintiff back to Dr. Karas. (Tr. 269–71). On June 29, 2010, Dr. Karas noted that a Doppler flow study was "positive for severe vasogenic compression of subclavian artery on the right side." (Tr. 335). He diagnosed her with "severe thoracic outlet syndrome of the right arm, neurogenic and vasogenic." (Tr. 335). Plaintiff "used to work for Giant as a florist but now she is out of work." (Tr. 334). On July 9, 2010, Plaintiff underwent a surgical release of thoracic outlet syndrome of her right arm with Dr. Karas. (Tr. 250, 262–65, 495–503, 645–46). On discharge, he instructed her to avoid "heavy lifting over 10 pounds for a month." (Tr. 246, 645).

Thus, for Plaintiff's first two surgeries, prior to the relevant period, she was diagnosed with both vascular and neurogenic thoracic outlet syndrome. *Supra.* Plaintiff continued to report pain to Dr. Vonah and treated with narcotics. (Tr. 379-80, 432, 588–92, 671). Dr. Vonah noted that "I would have thought the thoracic outlet surgeries would have provided her more relief. Her surgeon who did the surgeries did feel that maybe there was some permanent damage that occurred before the surgery that would not be reversible." (Tr. 380). At follow-ups with Dr. Karas in September and November of 2010, he noted residual muscle spasm and pain in the

**2.** Her private insurance initially refused to allow her to "cross a state border for treatment." (Tr. 441). Her physician authored à letter opining that treatment with Dr. Karas was medically necessary because he had performed "a thousand of these operations" and the local provider "may have performed five." (Tr. 294, 441).

right shoulder that caused Plaintiff to drop things. (Tr. 325–26, 665–66). In January, February, and April of 2011, Plaintiff reported continued arm pain, described as "[s]evere root canal-like pain that radiates up from the fingers all throughout the entire right arm into the axillary areas and up into the head." (Tr. 359, 365, 563, 567–72). By April of 2011, Dr. Vonah noted that Plaintiff's right sided thoracic outlet syndromes were flaring and examination indicated tenderness, "mild pain w/ motion," no muscle spasm, no sensory loss, decreased grip strength, and slightly decreased reflexes in the right arm. (Tr. 566).

When Plaintiff's symptoms flared in mid–2011, she was diagnosed with only neurogenic thoracic outlet syndrome. A Doppler blood flow study by Dr. Campbell was normal, excluding vascular thoracic outlet syndrome. (Tr. 706, 714). Dr. Vonah's physical examination repeatedly indicated decreased grip strength, reflexes, and range of motion. (Tr. 549, 554, 559–60, 566). Dr. Karas' physical examination indicated positive Adson sign and Roes test, fatigue in the right arm after a few seconds of exercise, "severe sensitivity" near the right subclavian artery, and "intolerable and painful" examination of the brachial plexus. (Tr. 707). He described this as "severe brachial plexopathy." (Tr. 510). Dr. Karas diagnosed her with "thoracic outlet syndrome of the right arm, neurogenic." (Tr. 505). Dr. Karas performed surgery in December of 2011, and noted that her brachial plexus, C6 nerve root, veins and arteries were "buried in thick scar" tissue. (Tr. 510).

Records from Dr. Vonah and Dr. Campbell in 2012 and 2013 indicate that Plaintiff's vascular symptoms improved, but that her neurological symptoms remained. Dr. Vonah explained that Plaintiff's "vascular symptoms" had improved, but she continued with "parathesias and decreased [range of motion]," Plaintiff's "symptoms sound like a compressive neuropathy or some kind of brachial plexopathy ... It may be that her surgery helped vascular structures but scar tissue or injury to neurological structures may be the problem," and Plaintiff's arms pains "may be from nerve impingement in the brachial plexus." (Tr. 518, 522, 782). Dr. Vonah indicated that Plaintiff had "known brachial plexus issues." (Tr. 770). Examinations at various times indicated that Plaintiff's left and right hands were swollen, she had moderate pain with range of motion in both shoulders, she was "chronically ill-appearing, depressed" with "trapezius tenderness/spasm," reduced and stiff range of motion, mildly decreased strength in her upper extremities, tenderness and pain with range of motion in her spine, shoulder, elbow, and hands. (Tr. 763, 777).

Dr. Campbell excluded vascular thoracic outlet syndrome, but observed that "[o]n hyperabducting her arms it was obvious that her right arm was weak....The grip strength with the right hand is markedly less than the left hand. She had trouble pushing ... with her right hand." (Tr. 711). He explained that "the degree of weakness" was "impressive" and that she should be evaluated by a neurologist "to define what the extent of her disability with the right arm is at this point." (Tr. 711). He noted that "with time she might get some improvement in nerve function if it is just a compression of the nerve rather than a transsection." (Tr. 711). At some point in 2012 or 2013, Plaintiff treated with a neurologist at Hershey Medical Center, but the ALJ did not obtain those records. (Tr. 760).

On May 1, 2011, Dr. Sims authored a medical opinion. (Tr. 458). She explained that Plaintiff had "cervical ribs which impinge upon her brachial plexus and affect

the blood supply of her arms and cause her severe chronic pain." (Tr. 458). She wrote that "I can tell you from my physical exam of her, she does indeed appear to be disabled." (Tr. 458). Dr. Sims had earlier noted in a treatment record that Plaintiff was "disabled with her chronic pain syndrome from her cervical rib problems." (Tr. 478).

On March 8, 2012, Plaintiff submitted a Function Report. (Tr. 184). She indicated her medications make her "tired" and "foggy." (Tr. 184, 186). She reported that she does not handle stress or changes in routine well and "just cr[ies] about how [she] live[s] now." (Tr. 183). She reported that she could follow instructions but did not finish what she started. (Tr. 182). She indicated problems lifting, squatting, standing, reaching, walking, sitting, kneeling, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with others. (Tr. 182). She indicated that she "can't do the things people are doing so [she] lost all her friends." (Tr. 182). She indicated that she did not spend time with others, go places on a regular basis, or leave the house alone. (Tr. 181). She reported that she did not cook, perform household chores, or shop and had problems showering and caring for her hair. (Tr. 177–81). She indicated that she spends her day reading, lying on the floor, sitting in a chair, and watching television. (Tr. 178). She reported that her neck, back and arm pain began in 2010 and occurred "all the time." (Tr. 185).

On May 3, 2012, state agency physician Dr. Maura Smith–Mitsky, M.D., reviewed Plaintiff's file and authored a medical opinion. (Tr. 63). She notes Dr. Sims' opinion that Plaintiff is "unable to work." (Tr. 63). Dr. Smith–Mitsky acknowledged that Dr. Sims' opinion was conclusory, but opined it was supported by the longitudinal medical records and "aggressive pain treatment including surgery." (Tr. 63). She noted that Plaintiff was "failing pain control methods" and taking narcotics with no evidence of "abuse or diversion." (Tr. 63). Dr. Smith–Mitsky explained that Plaintiff was credible and her claims were substantiated by the medical record, there were "no material contradictions or inconsistencies," and no treating provider suspected that she was malingering, amplifying her symptoms, or drug seeking. (Tr. 63). Dr. Smith–Mitsky evaluated Plaintiff's application as a reopening of her prior application because there was new evidence that supported a claim of disability to her initial onset date in June of 2010. (Tr. 63). She opined that Plaintiff would not be able to "sustain work" and that her statements were "substantiated by the objective medical evidence alone." (Tr. 62). She indicated that Plaintiff's ability to reach, handle, finger and feel with her right upper extremity was limited. (Tr. 63). Dr. Smith–Mitsky acknowledged the distinction between neurogenic and vascular thoracic outlet syndrome, noting Plaintiff's Reynaud's syndrome and explaining that Dr. Karas assessed Plaintiff to have "neurogenic pain, more of a neural compression than vascular, but some venous compression." (Tr. 63). She noted that Plaintiff's continued pain in 2012 was neuropathic and she could not "get comfortable" due to arm pain. (Tr. 63).

On August 14, 2012, state agency physician Dr. Phyllis Sandell, M.D., reviewed the file and authored an opinion. (Tr. 695). Dr. Sandell also noted that Plaintiff's pain was neuropathic, rather than vascular, in nature, and cited her Reynaud's syndrome. (Tr. 689). She cites Dr. Karas' explanation that her pain may be due to brachial plexopathy, characteristic of neurogenic, rather than vascular, thoracic outlet syndrome. (Tr. 690). Dr. Sandell concurred with Dr. Smith–Mitsky

that Plaintiff could not push or pull with her right upper extremity and that "[d]ue to chronically present pain, uncomfortable in most positions, and difficulty sleeping ... would not be able to sustain even sedentary work for 40 hours." (Tr. 690).

It is unclear whether Dr. Vonah opined that Plaintiff was disabled. In July of 2011, a CRNP in Dr. Vonah's office noted that she forwarded "disability forms" to Dr. Vonah. (Tr. 562). In every visit thereafter, Dr. Vonah listed Plaintiff's employment status as "disabled." (Tr. 516, 522, 528, 534, 540, 546, 551). No "disability forms" from Dr. Vonah appear in the record. Doc. 10.

On August 6, 2013, the ALJ held a hearing. (Tr. 26). Although at least three medical opinions existed in Plaintiff's file at the time of the hearing, all indicating that she was disabled, the ALJ called an additional medical expert, Dr. David Owens, M.D., at the hearing. (Tr. 41). Dr. Owens indicated that he was board certified in family medicine and geriatrics. (Tr. 41). He opined that her bilateral thoracic outlet syndrome was medically determinable and severe, and cited decreased grip strength and weakness in the right arm. (Tr. 42). He opined that she could lift ten pounds occasionally and five pounds frequently. (Tr. 43). He opined that she could sit for six hours, stand for four hours, and walk for four hours with a sit/stand option at will. (Tr. 44). He did not address whether she could sustain activity for a forty-hour workweek. (Tr. 44). He did not identify how often Plaintiff would miss work. (Tr. 41). He opined that her fine manipulation was "okay" and that she could perform gross manipulation occasionally. (Tr. 44). He did not differentiate neurogenic from vascular thoracic outlet syndrome. (Tr. 42). He did not acknowledge Plaintiff's Reynaud's syndrome. (Tr. 42).

Plaintiff appeared and testified. (Tr. 29). She testified that she relies on her daughter for food, shopping, dishes, vacuuming, and taking out the trash. (Tr. 35). She testified that she had problems sitting, standing, and walking, and could walk or stand for twenty minutes at a time and sit for forty minutes at a time. (Tr. 36). She explained that if she sat for too long, her thoracic outlet syndrome would cause a nerve to pinch in her arm, and it would turn blue. (Tr. 39). She testified that her medications caused weight gain, drowsiness, and constipation. (Tr. 37). She testified that she "drop[s] things a lot" and uses her legs or feet to pick things up. (Tr. 38). A VE also appeared and testified and opined that a claimant with the limitations identified by the ALJ could perform work in the economy. (Tr. 48–50).

On August 14, 2013, the ALJ issued the decision. (Tr. 24). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 2, 2011. (Tr. 16). At step two, the ALJ found that Plaintiff's depression, migraines, sleep disorder, and thoracic outlet syndrome were medically determinable and severe. (Tr. 17). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 18). The ALJ found that Plaintiff had the RFC to perform:

[L]less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) in that the claimant is limited to lifting five pounds on a frequent basis. She is able to stand/walk for four hours during an eight-hour workday and requires the ability to alternate between sitting and standing positions at will. She is capable of occasional pushing, pulling, stair climbing, ramp climbing, balancing, stooping, kneeling, crouching, crawling, and gross manipulation. She may never climb ladders or scaffolds and must avoid concen-

trated exposure to heights, moving machinery parts, and driving as part of her work. Finally, her work should be limited to simple, routine, and repetitive tasks. She has no limitation as to fine manipulation.

(Tr. 19–20). A step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 23). At step five, in accordance with VE testimony, the ALJ found that Plaintiff could perform other work in the national economy. (Tr. 24). Thus, the ALJ found that Plaintiff was not disabled or entitled to benefits. (Tr. 24).

## V. Plaintiff Allegations of Error

### A. Assignment of Weight to the Medical Opinions

The ALJ wrote that he gave "significant weight" to the "medical opinions of Dr. Vonah" and Dr. Owens, "moderate weight" to the "medical opinions of Dr. Campbell and Dr. Karas, who treated the claimant on a limited basis during the relevant period," and "limited weight" to Dr. Smith–Mitsky and Dr. Sandell because they were contradicted by "the most recent findings of Dr. Campbell and Dr. Vonah, who noted the claimant's mild to moderate discomfort and restricted range of motion." (Tr. 22). The ALJ did not mention Dr. Sims' opinion, but wrote that "any other opinion in the medical evidence of record indicating that the claimant is disabled is given little weight, as this is an issue reserved to the Commissioner." (Tr. 22).

Although the ALJ implies that Dr. Vonah, Dr. Campbell, and Dr. Karas authored "medical opinions" that supported the RFC, no medical opinion supporting the ALJ's finding from those providers exists in the record. (Tr. 22). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Dr. Campbell simply evaluated blood flow studies. (Tr. 706). It is unclear whether Dr. Vonah opined that Plaintiff was disabled. In July of 2011, a CRNP in Dr. Vonah's office noted that she forwarded "disability forms" to Dr. Vonah. (Tr. 562). In every visit thereafter, Dr. Vonah listed Plaintiff's employment status as "disabled." (Tr. 516, 522, 528, 534, 540, 546, 551). No "disability forms" from Dr. Vonah appear in the record. Doc. 10. Dr. Karas released Plaintiff to work in 2009 and 2010, but there is no evidence he rereleased her to work after her 2011 surgery. *Supra.* Only Dr. Owens' medical opinion supports the ALJ's denial, while Dr. Smith–Mitsky, Dr. Sandell, Dr. Sims, and possibly Dr. Vonah opined that Plaintiff is disabled. *Supra.*

Opinions can come from various sources, including treating physicians, examining physicians, and non-examining physicians. 20 C.F.R. §§ 404.1527(c)(1)–(2). A single state agency medical opinion may provide substantial evidence to find that a claimant is not disabled, particularly when it is the only medical opinion in the record and non-medical evidence contradict disability. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361–63 (3d Cir.2011). In *Chandler*, no treating source medical opinion existed in the record before the ALJ. *Id.* at 360 (Claimant's treating physician opinions could not "be considered by the District Court in making its substantial evidence review" because they were not timely filed before the ALJ). The only medical opinion in the record was from a state agency physician who opined that the claimant was not disabled. *Id.* at 361–63. Non-medical evi-

dence also supported the ALJ's decision. *Id.* The claimant made inconsistent claims, as she "reported extreme pain to doctors and claimed that she had to lie down most of the day, but she also testified that she managed to shop several times per week, cook dinner, care for her two children, and visit with friends" and stated "she [was] able to do her activities of daily living." *Id.* at 363; *see also* SSR 96–7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information").

However, treating sources are entitled to special deference. *See Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir.2000) ("A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time") (internal quotations and citations omitted). If the state agency opinion is the only evidence that supports the denial, the opinion may not provide substantial evidence to find the claimant not disabled. *Id.* ("A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict ... Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)").

Since the Regulations were amended in 1991 to include standards for evaluating medical opinion, the Third Circuit has not affirmed, in a precedential opinion, any ALJ who rejects a treating physician opinion within only a single state agency non-examining medical opinion. In *Morales v. Apfel,* 225 F.3d 310 (3d Cir.2000), the Third Circuit reversed an ALJ who rejected a treating physician opinion with only a

single state agency non-examining medical opinion. *Id.* at 317. The ALJ relied on "personal observations of [the claimant] at the administrative hearing ... evidence in the record of malingering, and notations in ... treatment notes that [the claimant] was stable and well controlled with medication." *Morales,* 225 F.3d at 317. The Third Circuit held that the ALJ could not "disregard [the treating] medical opinion based solely on his own amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility." *Id.* at 318 (internal citations omitted). The Third Circuit explained that the ALJ relied on "pieces of the examination reports that supported this determination," but "[t]he Commissioner cannot reject [the treating source's] medical opinion simply by having the ALJ make a different medical judgment." *Id.* In *Brownawell v. Comm'r Of Soc. Sec.,* 554 F.3d 352 (3d Cir.2008), the Third Circuit reversed an ALJ who rejected a treating source medical opinion and a state agency examining medical opinion with only a single state agency non-examining opinion, explaining:

> The ALJ ignored the opinions of Dr. Grem and Dr. Picciotto and instead chose to adopt the opinion of Dr. Rightmyer, a non-examining psychologist who found that Brownawell was not disabled. *See A.R.* at 301. In evaluating the ALJ's use of Dr. Rightmyer's opinion, it must be noted that the opinion itself is subject to some criticism. Like the ALJ, Dr. Rightmyer ignores the possibility that Dr. Picciotto was not inconsistent in finding that Brownawell has a good ability to concentrate for the purpose of a medical examination but no ability to concentrate for the purposes of steady employment. Dr. Rightmyer also discounts Dr. Grem's assertions of disability based on Grem's own treatment notes but, as noted *supra,* a doc-

tor's notation that a condition is "stable" during treatment does not necessarily support the conclusion that the patient is able to work. *See Morales*, 225 F.3d at 319. Given these errors and the fact that this Court has "consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when such testimony conflicts with testimony of the claimant's treating physician," the decision to discredit Dr. Grem and Dr. Picciotto, both of whom actually examined Brownawell, was improper. *Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir.1986) (citations omitted).

*Brownawell v. Comm'r Of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir.2008). In *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir.2009), the Third Circuit reversed an ALJ who relied on three examining state agency opinions to reject a single treating source opinion because:

> The three doctors relied upon by the ALJ—Drs. Merlin, Potashnick, and Tiersten—issued fairly perfunctory reports after brief exams and noted Diaz's successful navigation of the examining table. Dr. Noor, on the other hand, noted severe arthritic changes, and limited range of motion, in Diaz's knees.

*Id.* at 505. The Third Circuit has affirmed an ALJ who rejects a treating physician opinion when two or more state agency medical opinions support the denial. *See Jones v. Sullivan*, 954 F.2d 125 (3d Cir. 1991); *Brown v. Astrue*, 649 F.3d 193 (3d Cir.2011). The Third Circuit has also affirmed an ALJ who credits several treating sources over another treating source, thereby not implicating the heightened standard required to reject evidence from treating sources in favor of evidence of non-treating sources. *Plummer v. Apfel*, 186 F.3d 422 (3d Cir.1999).

Here, the ALJ did not acknowledge Dr. Sims' opinion, which alone requires remand. The ALJ must evaluate every medical opinion, particularly from treating professionals. Section 1527(c) states that the ALJ "will evaluate every medical opinion we receive." *Id.* There is a heightened requirement in Section 1527(c)(2), which applies only to treating physicians. Section 1527(c)(2) states that ALJs "will *always give good reasons* in [the] *notice of determination or decision* for the weight we give your treating physician's opinion." *Id.* (emphasis added). The ALJ's treatment of Dr. Vonah's records is confusing and internally contradictory. Dr. Vonah repeatedly indicated that Plaintiff was "disabled," but the ALJ purports to assign Dr. Vonah "significant weight." (Tr. 22, 785). The ALJ also wrote that he gave "limited" weight to opinions that Plaintiff was "disabled." (Tr. 22).

Characterizing either Dr. Sims' or Dr. Vonah's opinion as reserved to the issue of the Commissioner does not render the ALJ's error harmless. The Regulations require an ALJ to recontact the treating physician:

> Some commenters were concerned that the proposed language of §§ 404.1527(b) and (c), and 416.927(b) and (c) permitted us to discount a treating source's apparently unsupported opinion without recontacting the source, and that the rules placed highly restrictive conditions on obtaining additional information from treating sources.

> Response: To the contrary, recontact with treating sources to complete the case record and to resolve any inconsistencies in the evidence is one of the principal provisions of this set of rules ... far from being restrictive, the intent of these rules is to require such contacts.

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932–01, 36951–36952; *see also* SSR 96–5p ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."). The ALJ has failed to provide "good reason" to reject treating source medical opinions from Dr. Sims and Dr. Vonah, and the Court recommends remand on this ground.

The ALJ also lacked substantial evidence for assigning Dr. Owens more weight than Dr. Smith–Mitsky and Dr. Sandell. The only reason provided for assigning Dr. Owens more weight than Dr. Smith–Mitsky and Dr. Sandell were "the most recent findings of Dr. Campbell and Dr. Vonah, who noted the claimant's mild to moderate discomfort and restricted range of motion." (Tr. 22). Earlier, the ALJ cites extensively to Dr. Campbell's July 2012 report ruling out vascular thoracic outlet symptom. (Tr. 21). The ALJ also noted Dr. Vonah's report that Plaintiff's "vascular" symptoms had "improved." (Tr. 21). Neither record indicates her neurogenic symptoms had improved.

For Plaintiff's first two surgeries, prior to the relevant period, she was diagnosed with both vascular and neurogenic thoracic outlet syndrome. However, when Plaintiff's symptoms flared in mid–2011, she was diagnosed with only neurogenic thoracic outlet syndrome. A Doppler blood flow study by Dr. Campbell was normal, excluding vascular thoracic outlet syndrome. (Tr. 706, 714). Plaintiff's symptomology was still so severe that she required surgery. (Tr. 505, 510). Subse-

quent records from Dr. Vonah and Dr. Campbell indicate that Plaintiff's vascular symptoms improved, but that her neurological symptoms remained. *Supra.* The ALJ failed to recognize that Dr. Campbell's and Dr. Vonah's 2012 and 2013 records excluded vascular symptoms, but not neurological symptoms. They do not provide substantial evidence to credit Dr. Owens' opinion over opinions from Dr. Smith–Mitsky, Dr. Sandell, Dr. Sims, and Dr. Vonah.

Defendant asserts that Dr. Sandell's opinion was internally inconsistent, because she opined that Plaintiff could work for a full eight-hour work day, but could not work forty hours in a week. (Def. Brief at 20). Plaintiff's ability to work a full day is not inconsistent with in inability to work a full week. Defendant also contends that "none of Plaintiff's treating physicians indicated that she could not work," but, as discussed above, Dr. Sims and likely Dr. Vonah opined that Plaintiff was disabled. *Supra.* Defendant cites *Chandler.* (Def. Brief at 19). However, the only precedential holding in *Chandler* is the unremarkable finding that an ALJ may rely on a state agency medical opinion that the claimant is not disabled when there are no medical opinions from treating sources that the claimant is disabled. *See Chandler,* 667 F.3d at 361–63. Unlike *Chandler,* a treating source opined here that Plaintiff was disabled. *Id.* Unlike *Brown, Plummer,* and *Jones,* the ALJ did not rely on multiple state agency medical opinions to reject the treating source medical opinion. *See Jones,* 954 F.2d at 129; *Plummer,* 186 F.3d at 430; *Brown,* 649 F.3d at 194. Like *Morales,* the ALJ relied on a single non-examining state agency opinion. *Morales,* 225 F.3d at 317. Like *Brownawell,* the treating source opinion here was corroborated by a state agency opinion that the claimant was disabled. *Brownawell,* 554 F.3d at 357. Like *Diaz,*

the opinion relied on by the ALJ was more cursory and omitted objective findings documented in the treatment record. *Diaz,* 577 F.3d at 506.

The ALJ lacked substantial evidence to reject the opinions from Plaintiff's treating physicians, along with the state agency reviewing opinions by Dr. Smith–Mitsky and Dr. Sandall. *See Morales,* 225 F.3d at 317; *Brownawell,* 554 F.3d at 357; *Diaz,* 577 F.3d at 506. The Court recommends remand for proper evaluation of the medical opinions.

## B. Credibility

The ALJ found that Plaintiff was not "entirely credible." (Tr. 20). The ALJ relied on Plaintiff's ability "to perform activities of daily living such as dressing and feeding herself." (Tr. 22). These are sporadic and transitory activities that do not support the ALJ's RFC. *Fargnoli v. Massanari,* 247 F.3d 34, 44 (3d Cir.2001) (citing *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.,* 48 F.3d 114, 119 (3d Cir.1995)); *see also Wright v. Sullivan,* 900 F.2d 675, 682 (3d Cir.1990); *Smith v. Califano,* 637 F.2d 968, 971 (3d Cir.1981).

The only remaining rationale is the purported lack of objective medical evidence.[3] (Tr. 20–22). The ALJ discussed objective medical evidence showing improvement in vascular, but not neurogenic symptoms and wrote that the RFC was supported "by the medical opinions of Dr. Vonah, Dr. Owens, Dr. Campbell, and Dr. Karas." (Tr. 23). First, as discussed above, the ALJ erred by conflating vascular symptoms with neurogenic symptoms and by implying that Dr. Vonah, Dr. Campbell, and Dr. Karas authored opinions supporting the RFC. *See Cotter v. Harris,* 642 F.2d 700, 707 (3d Cir.1981) ("Since the

ALJ ... misconstrued the evidence considered, his conclusion ... must be reconsidered"). Second, lack of objective evidence, alone, does not provide substantial evidence for an adverse credibility finding. 20 C.F.R. § 404.1529(c)(2); *see also Green v. Schweiker,* 749 F.2d 1066, 1071 (3d Cir. 1984); *Mason,* 994 F.2d at 1067–68; *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985).

The ALJ's factual determination of credibility warrants deference. *Zirnsak v. Colvin,* 777 F.3d 607, 612–13 (3d Cir.2014). However, claimants' statements receive serious consideration when not substantiated by objective medical evidence and great weight when substantiated by objective medical evidence. *Mason,* 994 F.2d at 1067–68 (internal citations omitted). The ALJ must provide satisfactory explanation for rejecting evidence and cannot reject evidence for the "wrong reason." *Morales,* 225 F.3d at 317–18 (internal citations omitted). Review of this explanation must be based on "the administrative record [that was] already in existence" before the agency, not "some new record made initially in the reviewing court or post-hoc rationalizations made after the disputed action." *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir.2013). Here, the ALJ rejected Plaintiff's credibility for the wrong reasons and failed to provide sufficient explanation for rejecting her subjective claims. The Court recommends remand for a proper credibility evaluation.

## C. Other Allegations of Error

Because the Court recommends remand on these grounds, it declines to address

---

**3.** Plaintiff's addiction to narcotics should not be used to undermine her credibility because she took narcotics as prescribed by her physicians. *See* SSR 13–2p (Drug addiction "does not include ... [a]ddiction to, or use of, prescription medications taken as prescribed, including methadone and narcotic pain medications").

Plaintiff's other allegations. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10–1096, 2011 WL 1456166, at \*7 (W.D.Pa. Apr. 14, 2011).

## D. Remedy

Remand, rather than reversal and award of benefits, is the appropriate remedy in this case. The ALJ should be afforded the opportunity to develop either non-medical evidence or medical opinion evidence to support the denial of benefits. *See Markle v. Barnhart*, 324 F.3d 182, 189 (3d Cir. 2003) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotations omitted).

## VI. Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1. The decision of the Commissioner of Social Security denying Plaintiff's benefits under the Act be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2. The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: January 20, 2016.